In re HEMINGWAY TRANSPORT, INC., Bristol Terminals, Inc., Debtors.

JUNIPER DEVELOPMENT GROUP, a Massachusetts Partnership and George D. Whitten, Amy Whitten and Charles Whitten as Trustees of 60 Olympia Nominee Trust, Plaintiffs,

v.

Herbert C. KAHN, Trustee for Hemingway Transport, Inc., and Bristol Terminals, Inc., Defendants.

Herbert C. KAHN, Trustee for Hemingway Transport, Inc. and Bristol Terminals, Inc., Third–Party Plaintiffs,

v.

WOBURN ASSOCIATES, Third–Party Defendant.

Bankruptcy Nos. 82–1340–JNG, 82–1341–JNG.
Adv. No. 86–1081.

United States Bankruptcy Court, D. Massachusetts.

Sept. 13, 1989.

See also, Bkrtcy., 73 B.R. 494.

Louis N. Massery, Cooley, Manion, Moore & Jones, Boston, Mass., for plaintiffs.

William F. Macauley, Craig and Macauley, Boston, Mass., for trustee (defendant and third-party plaintiff).

Thomas V. Urmy, Jr., Shapiro, Grace & Haber, Boston, Mass., for third party defendant.

## MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

### I. INTRODUCTION

On June 6, 1989, the Trustee filed a single pleading captioned "Motion for Reconsideration or, in the Alternative, Clarification of Administrative Expense Ruling, and Motion for Summary Judgment on Scope of Claim for Future Response Costs." The plaintiffs in this protracted adversary proceeding, Juniper Development Group and the trustees of the 60 Olympia Avenue Nominee Trust (collectively "Juniper"), filed an opposition to the Trustee's motions. The Court conducted a hearing on July 26, 1989. At the conclusion of the hearing, the Court took the Trustee's motions under advisement. The Trustee's Motion for Summary Judgment which involves the application of section 502(e)(1)(B) of the Bankruptcy Code to Juniper's claim for future response costs, is the subject of this memorandum, the

fourth memorandum generated by this complex case that perforce involves the conflicting policies embodied in the Bankruptcy Code and the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), 42 U.S.C.A. §§ 9601–9615 (West 1983 & Supp. 1989).[1]

## II. BACKGROUND

Although the facts of this case have been outlined in other opinions, recently completed discovery and recent developments in the case make a recitation of salient events advisable. No material facts are in dispute.

On July 28, 1982, the Debtors, Hemingway Transport, Inc. ("Hemingway") and Bristol Terminals, Inc. ("Bristol") filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code. The proceedings subsequently were converted to Chapter 7 on November 18, 1983. While in Chapter 11, however, the Debtors sought and obtained Court approval for the sale of real property, together with all structures and improvements, located at 60 Olympia Avenue, Woburn, Massachusetts to Juniper.[2]

In April 1985, almost two years after the consummation of the Court authorized sale, a representative of the Environmental Protection Agency ("EPA") discovered a number of barrels containing hazardous waste on the Olympia Avenue property. After performing tests on the contents of the drums and soil, the EPA, on February 7, 1986, issued an administrative order pursuant to section 106(a) of CERCLA. The order contained an administrative determination that the Olympia Avenue property was a "facility" as defined in section 101(9) of CERCLA, 42 U.S.C. § 9601(9); that the trustees of the 60 Olympia Avenue Nominee Trust were "persons" and "owners" as defined in sections 101(21) and (20), respectively, of CERCLA, 42 U.S.C. § 9601(21), (20); that substances found in the soil and drums on the property were "hazardous substances" as defined by section 101(14) of CERCLA, 42 U.S.C. § 9601(14); that the past, present and potential migration of such hazardous substances constituted an "actual or threatened release" as defined by section 101(22) of CERCLA, 42 U.S.C. § 9601(22); and that the trustees as present owners of the Olympia Avenue property were responsible parties pursuant to section 107(a) of CERCLA, 42 U.S.C. § 9607(a). The administrative order directed the trustees to remove the drums and surrounding soil. Juniper complied with the order and hired a contractor to remove the barrels and contaminated topsoil. Juniper alleges that it has expended over $60,000 in complying with the administrative order.

On May 7, 1986, Juniper commenced the instant adversary proceeding. Juniper sought indemnification or contribution for "response costs" incurred as a result of compliance with the administrative order, as well as any future costs associated with

---

1. Commenting on CERCLA, and, parenthetically, the Bankruptcy Reform Act, Judge Young of the United States District Court for the District of Massachusetts has noted:

 Certain statutes stand out as models of the art of legislative draftsmanship. *See e.g.,* 18 U.S.C. § 361 (Supp.1946), commended by Professor Alfred Conard in *New Ways to Write Laws,* 56 Yale L.J. 458 at 469, 478 (1947). Others, frequently those enacted in the "harried and hurried" atmosphere prevalent during the final days of a legislative session, *see Shine v. Shine,* 802 F.2d 583, 587 (1st Cir. 1986) commenting on the Bankruptcy Reform Act; *see also In re Mojica,* 30 B.R. 925, 930 (Bankr.E.D.N.Y.1983) achieve a certain quirky notoriety precisely because they are so badly drafted as to be virtually incomprehensi-

 ble.... Prominent among this latter group is CERCLA.... "CERCLA has acquired a well-deserved notoriety for vaguely drafted provisions and an indefinite, if not contradictory, legislative history." *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1080 (1st Cir.1986), quoting *United States v. Mottolo,* 605 F.Supp. 898, 902 (D.N.H.1985). *In re Acushnet River & New Bedford Harbor Proceedings,* 675 F.Supp. 22, 25–26 n. 2 (D.Mass. 1987).

2. The purchase and sale agreement identified Bristol as the seller and George D. Whitten, a general partner of Juniper as the buyer. 60 Olympia Avenue Trust is identified in the plaintiffs' amended complaint as a d/b/a of Juniper.

the cleanup. Juniper also sought relief under theories of fraud, equitable recision and breach of warranty. On September 8, 1986, the Trustee moved for summary judgment. The Court ruled in favor of the Trustee on all counts and causes of action directly related to the sale of the property. However, the Court denied the Trustee's motion with respect to Juniper's CERCLA claims and, indeed, allowed Juniper to amend its adversary complaint to include the statutory prerequisites set forth in section 107(a)(2)(B) of CERCLA. The Court also ruled that, if Juniper prevailed on its claim, response costs incurred by Juniper would be entitled to treatment as administrative expenses. Additionally, the Court indicated that it would schedule a hearing "for the purpose of establishing the exact amount of Juniper's response costs and estimating its future response costs...." *See In re Hemingway Transport, Inc.,* 73 B.R. 494 (Bankr.D.Mass.1987).

While the language utilized by the Court possibly may have suggested otherwise, the Court neither found that Hemingway was liable to Juniper nor precluded the Trustee from raising an objection to Juniper's claim for future response costs under section 502(e)(1)(B) of the Bankruptcy Code. A ruling in favor of the Trustee with respect to his pending section 502(e)(1)(B) summary judgment motion obviously would obviate the need for a hearing pursuant to section 502(c) to estimate Juniper's future response costs.

In May of 1987, Juniper filed its amended complaint. The amended complaint contains the following allegations: 1) that the Trustee knew or had reason to know that the Massachusetts Department of Environmental Quality Engineering ("DEQE") had issued an administrative order to the Debtors in 1982 or earlier requiring them to cleanup the Olympia Avenue property; 2) that the Debtors owned the property and/or operated a facility at the property at the time the barrels of hazardous waste were deposited; and 3) that the Debtors, as potentially responsible parties, are responsible for either all or part of the cleanup. Thus, through its complaint, Juniper requests the following:

... complete indemnification from the defendant for all past and future costs incurred or assessed for said cleanup, and exercises its right of subrogation to the E.P.A. or the D.E.Q.E., against the defendant for all past and future costs incurred or assessed for said cleanup or in the alternative, requests contribution from the defendant on a pro-rata basis for all past and future costs incurred or assessed for said cleanup, plus interests, costs, and attorneys fees.

Parenthetically, Juniper's amended complaint is troublesome in two respects. In the first place, Juniper fails to specify whether it is proceeding under section 107(a) of CERCLA or under section 113(f)(1) of CERCLA or under both sections. Secondly, Juniper fails to allege that its response expenditures were consistent with the national contingency plan.

With respect to Juniper's allegation that the DEQE had informed the Debtors of the presence of toxic waste on the property, Juniper learned through a Freedom of Information Act request to the EPA that the barrels containing toxic waste were first discovered on the Olympia Avenue property on or around May 15, 1980 by William Cashins, a representative of the DEQE. Hemingway was informed of the discovery and responded to the DEQE by letter in November of 1980. Hemingway, however, failed to cleanup the property, despite repeated inspections by William Cashins in February and April of 1981.

About one year after the Court's summary judgment ruling, the EPA, by letter dated April 20, 1988, notified Juniper of its status as a potentially responsible party in connection with the so-called Wells G & H Superfund Site (the "Site"). The EPA demanded from Juniper payment of approximately $2.1 million, plus interest pursuant to section 107(a)(4)(D) of CERCLA. The Wells G & H Site is a 330–acre parcel of land that includes the 21.4 acres that comprise the Olympia Avenue property now owned by Juniper. According to the Trustee, wells G & H are municipal wells that were developed in the 1960's to supplement

the water supply for the City of Woburn. In 1979, the Woburn police discovered over 180, 55–gallon drums abandoned on the Site, which is now included in the Superfund National Priorities List of hazardous waste sites and the focus of much media attention due to litigation involving an alleged link between the incidence of childhood leukemia and contamination of Woburn's water supply.

By letter dated February 3, 1989, the EPA, pursuant to section 107(a)(2) of CERCLA, informed the Trustee of Hemingway's potential liability as a former owner or operator of the site "at the time of disposal of any hazardous substances." Notably, the EPA made no demand for payment on the Trustee.[3]

## III. DISCUSSION

The Trustee, through his motion for summary judgment, seeks the disallowance of Juniper's claim for future response costs under section 502(e)(1)(B) of the Bankruptcy Code because 1) Juniper's claim is one for reimbursement or contribution; 2) Juniper is liable with the Debtor on the claim; and 3) the claim is contingent upon future events.

### A. Section 502(e)(1)(B)

Section 502(e)(1)(B) of the Bankruptcy Code provides in relevant part:

> ... the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on ... the claim of a creditor, to the extent that such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution....

11 U.S.C. § 502(e)(1)(B).

In the Court's order of May 8, 1987, the Court referred to section 502(c) of the Bankruptcy Code. That section provides in relevant part: "there shall be estimated for purpose of allowance under this section— (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case maybe, would unduly delay the admin-

istration of the case." 11 U.S.C. § 502(c). *Collier* explains the relationship between section 502(c) and section 502(e)(1)(B) of the Bankruptcy Code as follows:

> While section 502(e)(1)(B), facially, would seem at war with section 502(c) dealing with estimation for purpose of allowance of contingent claims, it must be viewed from the standpoint of the surety or person secondarily liable with which it deals rather than from the standpoint of the debtor's creditor with which section 502(c) obviously deals. The two entities are vastly different and their legal imports in the context of the bankruptcy statute are vastly different. To be sure, section 502(a) provides that a claim which is filed under section 501 is deemed allowed. Thus, for purposes of section 502(e)(1)(B), the filing must be considered "the time of allowance or disallowance of such claim." If objection to the surety's claim is made on section 502(e)(1) grounds, then the time of allowance will be postponed until the hearing and ruling on the objection. Section 502(c), as already seen, mandates estimation for purpose of allowance of a contingent or unliquidated claim where fixing or liquidation of that claim "would unduly delay the closing of the case." But while a creditor may have his claim estimated for purpose of allowance and the right, therefore, to share in the distribution of the debtor's assets, a surety or person secondarily liable with the debtor on the claim of such creditor has no right to share in the distribution of the debtor's assets until such time as the creditor's claim shall have been paid in full. In recognition of the difference in status of the surety and the debtor's creditor, section 502(e)(1)(B), apparently, but not really in derogation of section 502(c), disallows any claim made by the surety or person secondarily liable with the debtor of any claim for reimbursement or contribution to the extent that that claim is contingent as of the time of allowance or disallowance. A claim of a surety is

---

**3.** Third-party defendant, Woburn Associates was also notified of its potential liability as a former owner of the property by letter dated February 3, 1989.

contingent, in this context, until the surety pays the principal creditor and thereby fixes his own right to payment from the debtor.

3 *Collier on Bankruptcy* ¶ 502.05 at 502-87–502–88 (15th ed.1989) (footnotes omitted).

In the context of this case, it is possible to view Juniper both as a direct creditor of Hemingway and as an entity jointly liable with the Debtor. To the extent Juniper undertook or undertakes remedial action to reduce or eliminate the threat of hazardous wastes it can recover those response costs from the person ultimately responsible. In this case that person allegedly is Hemingway. Section 502(c) then would appear to apply, if at all, to that type of claim for direct response costs. However, section 502(e)(1)(B) would appear to apply for claims for compensation or reimbursement for response costs incurred by the EPA for which Juniper might ultimately be adjudged liable.

**B. Applicable Provisions of CERCLA**

■ Although Juniper's complaint makes no reference to the specific section of CERCLA under which it is proceeding, there are only two applicable sections. The first, section 107(a) of CERCLA, provides in relevant part:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section— ...

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, ... shall be liable for—

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan....

42 U.S.C. § 9607(a). Courts are virtually unanimous in holding that a private right of action exists under CERCLA. *See e.g., Walls v. Waste Resource Corp.,* 761 F.2d 311 (6th Cir.1985); *United States v. New Castle County,* 642 F.Supp. 1258, 1261 (D.Del.1986); *Artesian Water Co. v.*

*Government of New Castle County,* 605 F.Supp. 1348 (D.Del.1985); *Pinole Point Properties, Inc. v. Bethlehem Steel Corp.,* 596 F.Supp. 283 (N.D.Cal.1984); *Jones v. Inmont Corp.,* 584 F.Supp. 1425 (S.D.Ohio 1984); *City of Philadelphia v. Stepan Chemical Co.,* 544 F.Supp. 1135 (E.D.Pa. 1982). According to the court in *New Castle County,* "[t]he right of action emanates from the plan language of the section and provides relief to any person incurring response costs for which another person is otherwise liable under the Act." 642 F.Supp. at 1262. Moreover, as the court in *New Castle County* recognized, prior to SARA, most courts were in agreement that a right of contribution existed under CERCLA, as well. *Id.* In that case, the court concluded that Congress did not expressly provide for a right of contribution and that such a right was not authorized by clear implication from section 107(a)(4)(B). However, the court did find that "Congress empowered the federal courts to establish a federal law of contribution under CERCLA." *Id.* at 1265. The court, in reaching this conclusion, relied on CERCLA's legislative history, recent legislative developments (i.e., consideration by Congress of SARA), and the presence of substantial federal interests, namely the promotion of expeditious settlement of Superfund suits and the protection of the Superfund's financial resources from depletion. *Id.* at 1268–69.

The second applicable section is section 113(f)(1) of CERCLA, which was added by SARA. It now makes plain that a right of contribution exists under CERCLA. It provides:

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines

are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 or section 9607 of this title.

42 U.S.C. § 9613(f)(1). The legislation, essentially was designed to ratify existing judicial decisions. 131 Cong. Rec. H. 11,083 (daily ed. Dec. 5, 1985). However, the Court notes that it may be problematic whether Juniper can assert a claim under this section because it only allows a person to seek contribution from another person who is liable or potentially liable, "during or following any civil action under section 9606 of this title or under section 9607(a) of this title...." 42 U.S.C. 9613(f). Juniper never has alleged that the administrative order of February 7, 1986 constitutes a civil action.

## C. Case Law

In *In re The Charter Company*, 862 F.2d 1500 (11th Cir.1989), the Court of Appeals for the Eleventh Circuit considered proofs of claim seeking contribution, reimbursement or indemnity from the debtor, The Charter Company ("Charter"). The claims against Charter arose from on-going lawsuits commenced by the United States, the State of Missouri, and approximately 500 other named plaintiffs to recover over $3 billion for injuries, losses and costs allegedly suffered or incurred due to the disposal of dioxin-bearing waste in Missouri. The claimants, who were alleged to have jointly owned, managed and controlled the manufacturing facility where the toxic waste was generated, alleged that Charter and another bankrupt entity, Independent Petrochemical Corporation ("IPC"), were jointly and severally liable to them under CERCLA for any monetary award that might be assessed against them since Charter and IPC arranged for the transportation of the waste. Charter and IPC objected to the claims pursuant to section 502(e)(1)(B) of the Bankruptcy Code, and the bankruptcy court disallowed the claims. The district court affirmed the bankruptcy courts ruling in *In re The Charter Co.*, 81 B.R. 644 (M.D.Fla.1987). *See* 862 F.2d at 1501–02.

The Eleventh Circuit noted that the claimants, through the proofs of claim in question, sought indemnification or, alternatively, contribution. The court stated:

All are claims for reimbursement or contribution pursuant to 42 U.S.C. § 9613(f)(1) and, as alleged by the appellants themselves, the claims are ones for which ... [the claimants] ... are liable with the debtor. Additionally, the claims were contingent at the time they were disallowed by the Bankruptcy Court. Any rights that ... [the claimants] ... may have to indemnity or contribution ·from Charter and IPC depend entirely on the success of the plaintiffs against the appellants in the still-pending Missouri litigation.

*Id.* at 1503 (footnote omitted). The court dismissed the claimants theoretical argument that they could assert private party claims pursuant to section 107(a)(4)(B) of CERCLA by undertaking remedial actions to reduce or eliminate the hazardous waste. These claims would not be for contribution, and Charter and IPC would not be jointly liable for them. The court stated:

Instead of alleging recompense due under CERCLA for response costs incurred *directly* by them, ... [the claimants] ... merely allege in their proofs of claim that they are entitled to compensation or reimbursement for response costs *incurred by the Missouri plaintiffs* for which ... [the claimants] ... may be ultimately adjudged liable. Thus, these admittedly contingent claims are ... also ones for which ... [the claimants] ... are necessarily "liable with the debtor."

*Id.* (footnote omitted).

From the foregoing case, it is apparent that in order for the Trustee to succeed in his objection to Juniper's claim for future response costs, which costs only could arise from a final judgment or a settlement in a case commenced by the United States against Juniper, as opposed to the response costs which Juniper has incurred to date pursuant to the administrative order of February 7, 1986, the Trustee must establish the following: 1) the claim must be one for reimbursement or contribution; 2) the

entity asserting the claim for reimbursement or contribution must be "liable with the debtor;" and 3) the claim must be contingent at the time of allowance or disallowance. *See In re Wedtech Corp.*, 85 B.R. 285, 289 (S.D.N.Y.1988); *In re Provincetown–Boston Airlines, Inc.*, 72 B.R. 307, 309 (Bankr.M.D.Fla.1987).

In *In re Wedtech Corp.*, 85 B.R. 285 (Bankr.S.D.N.Y.1988) ("Wedtech I"), and *In re Wedtech Corp.*, 87 B.R. 279 (Bankr.S. D.N.Y.1988) ("Wedtech II), bankruptcy courts elaborated on the requirements of section 502(e)(1)(B). In Wedtech I, the court considered the claimant's argument that the co-liability requirement permits section 502(e)(1)(B) to apply only where the underlying plaintiff (in this case, it would be the EPA) has filed a claim in the bankruptcy case and that claim has been allowed. The court found that "the statutory language of § 502(e)(1)(B) contains no such requirement." 85 B.R. at 289. The court indicated that, in contrast to section 502(e)(1)(A), which does contain the requirement that claims for contribution be disallowed to the extent that the creditors' claims against the estate are disallowed, 502(e)(1)(B) reflects the fact that "the purpose of disallowing contingent indemnity and contribution claims is precisely because they are so contingent." *Id.* at 290. The court also went on to indicate that the co-liability requirement cannot be interpreted to limit section 502(e)(1)(B) to instances where both the debtor and the claimant have been found liable in the underlying lawsuit. *Id.* The court stated:

> Indemnification, as opposed to the common law right of contribution, has no such requirement. More importantly, to interpret § 502(e)(1)(B) as requiring that a debtor be found liable in the underlying lawsuit would render it practically meaningless in light of § 362(a)'s automatic stay of actions to recover on pre-petition claims. Thus, the co-liability requirement is to be interpreted to require a finding that the causes of action in the underlying lawsuit assert claims upon

which, if proven, the debtor could be liable but for the automatic stay.

*Id.* (citations omitted).

In *Wedtech II*, the court rejected the argument of a claimant, KMG, that section 502(e)(1)(B) does not apply to joint tortfeasors. The court explained its decision as follows:

> KMG's admonition that the court read section 502(e)(1)(B) consistently with sections 501(b) and 509(a), each of which uses the phrase "an entity that is liable with the debtor" or a close variant, is not misguided. But KMG's conclusion that a joint tortfeasor is not such an entity who may pursuant to section 501(b) file a proof of claim if the underlying creditor does not do so is simply wrong. *See* 3 L. King, *Collier on Bankruptcy*, ¶ 501.02 at 501–11–501–12 and n. 7 (15th ed. 1988) (Fed.R.Bankr.P. 3005, in conjunction with section 501(b), makes it clear that anyone, including a joint tortfeasor, who is liable on a debt of the debtor is authorized to file in the name of the creditor). Moreover, section 509(a) does not by its terms exclude joint tortfeasors. If there were some theory by which the joint tortfeasor could claim subrogation, the statute would permit that subrogated claim.

87 B.R. at 284.

 With these precepts in mind, the Court has no difficulty concluding that the Trustee's Motion for Summary Judgment is allowable as to Juniper's claim for future response costs. Juniper denominates its claim for future response costs as one for indemnification or contribution, thereby satisfying the first requirement of section 502(e)(1)(B).[4]

With respect to the co-liability requirement, the Trustee, for purposes of his motion, has assumed liability *arguendo.* Clearly, both Juniper, as the present owner, and the Trustee, as a person who at the time of disposal of any hazardous substance owned the property, could be liable

---

**4.** In *In re Wedtech Corp.*, 85 B.R. 285, 289 (Bankr.S.D.N.Y.1988), the court ruled that "the

concept of reimbursement includes indemnity."

---

for the cost of remediating the property and the entire Wells G & H Site pursuant to sections 9607(a)(1) and (a)(2) of CERCLA, and the EPA has so determined by naming both potentially responsible parties.

Finally, the contingency of Juniper's claim for future response costs is obvious. With respect to obligations stemming from the administrative order, Juniper states in its complaint that it is awaiting "further orders for a possible future clean up...." With respect to costs of remediating the Wells G & H Site, any claim that Juniper would have would be contingent upon the United States commencing and prevailing in an enforcement action under CERCLA or Juniper's involvement in performing or financing cleanup work at the Site.

In its opposition to the Trustee's Motion for Summary Judgment, Juniper failed to address section 502(e)(1)(B) of the Bankruptcy Code, arguing instead that "there exist genuine issues of material fact as to Juniper's future liability at Wells G & H, and the future costs to be incurred." Although the Court can sympathize with Juniper's predicament, the material fact claimed to be in dispute is the very contingency the Trustee's motion addresses. Accordingly, the Court reiterates its finding that there are no material facts in dispute and hereby allows the Trustee's Motion for Summary Judgment.