In re HEMINGWAY TRANSPORT, INC. and Bristol Terminals, Inc., Debtors.

JUNIPER DEVELOPMENT GROUP, a Massachusetts Partnership; and George D. Whitten, Amy Whitten and Charles Whitten, as Trustees of 60 Olympia Nominee Trust, Appellants and Cross–Appellees,

v.

Herbert C. KAHN, Trustee for Hemingway Transport, Inc. and Bristol Terminals, Inc., Appellee and Cross–Appellant.

Civ. A. Nos. 90–10302–Z, 90–10431–Z and 90–10432–Z.

United States District Court, D. Massachusetts.

March 26, 1991.

Louis N. Massery, Roy Patrick Giarrusso, Cooley, Manion, Moore & Jones, Boston, Mass., for appellants and cross-appellees.

William Francis Macauley, Martin P. Desmery, Craig & Macauley, Boston, Mass., for appellee and cross-appellant.

## MEMORANDUM OF DECISION

ZOBEL, District Judge.

This consolidated bankruptcy appeal presents several issues of law arising out of three different decisions of the Bankruptcy Court. *See In re Hemingway Transport, Inc.,* 108 B.R. 378 (D.Mass. 1989); 105 B.R. 171 (D.Mass.1989); 73 B.R. 494 (D.Mass.1987). Briefly, the underlying facts are these: On July 28, 1982, the Debtors, Hemingway Transport, Inc. and Bristol Terminals, Inc. (collectively, "Hemingway"), filed voluntary petitions for bankruptcy under Chapter 11 of the Bankruptcy Code. (The proceedings subsequently were converted to Chapter 7 on November 18, 1983.) While in Chapter 11, the Debtors, with Court approval, sold a parcel of real property located at 60 Olympia Avenue, Woburn, Massachusetts ("the Property") to Juniper Development Group.

In April, 1985, a representative of the Environmental Protection Agency ("EPA") discovered a number of barrels containing hazardous waste on the Property. The EPA then issued an order pursuant to section 106(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9606(a) (1988), directing Juniper to remove the drums and surrounding soil. Juniper complied with the order. In 1986, Juniper commenced the instant adversary proceeding in which it seeks indemnification or contribution under CERCLA for past and future "response costs" incurred as a result of compliance with the EPA order. Two years later, on April 20, 1988, the EPA notified Juniper of its status as a "Potentially Responsible Party" in connection with the so-called Wells G & H Superfund Site, a 330–acre parcel of land which includes the Property now owned by Juniper.

Three separate decisions of the Bankruptcy Court are at issue. First, on May 8, 1987, the Bankruptcy Court, 73 B.R. 494, on a motion for summary judgment, held that Juniper's claims for response costs were entitled to administrative expense priority under the Bankruptcy Code. Hemingway appeals from this decision. Second, Juniper appeals from a decision, dated September 13, 1989, 105 B.R. 171, which (on another motion for summary judgment) disallowed, as contingent claims for reimbursement or contribution under § 502(e)(1)(B) of the Bankruptcy Code, Juniper's claims for future response costs. Third, in a decision dated December 18, 1989, 108 B.R. 378 (following an evidentiary hearing on October 17), the Bankruptcy Court held that neither attorney's fees nor prejudgment interest were recoverable as response costs under CERCLA. At the October 17 hearing, the Bankruptcy Court also excluded evidence concerning certain labor expenses which Juniper claimed as recoverable response costs; Juniper appeals this ruling as well.

*Standards of Review*

■ The opinions of the Bankruptcy Court, dated May 8, 1987 and September 13, 1989, both resolved motions for summary judgment. A district court, sitting in review, considers a bankruptcy court's decision to grant summary judgment *de novo. In re Two "S" Corp.,* 875 F.2d 240, 242 (9th Cir.1989). The standard for granting summary judgment in an adversarial bankruptcy proceeding is the same as in Rule 56(c), Federal Rules of Civil Procedure. Bankruptcy Rule 7056, 11 U.S.C. (1988). Summary judgment is appropriate if, viewing the evidence in the light most favorable to the party opposing the motion, the court finds that there is no genuine issue of material fact. Fed.R.Civ.P. 56(c); *see also General Office Prods. Corp. v. A.M. Capen's Sons,* 780 F.2d 1077, 1078 (1st Cir. 1986).

■ The appeals arising out of the October 17 evidentiary hearing and the resulting opinion are governed by a different standard. Bankruptcy Rule 8013 mandates

the application of the "clearly erroneous" standard of review with regard to findings of fact made by the Bankruptcy Court, and a "de novo" standard with respect to conclusions of law. *First Software Corp. v. Computer Assocs. Int'l*, 107 B.R. 417, 420 (D.Mass.1989). The issues presented in the instant appeal are questions of law.

*Administrative Expenses*

■ In enacting the Bankruptcy Code, Congress recognized that, if a business that has filed for bankruptcy is to continue operating for even a limited period of time, third parties must be willing to provide necessary goods and services. Since these parties will obviously not be so willing unless they are assured of payment ahead of pre-bankruptcy creditors, Congress provided a priority for administrative expenses, that is, "the actual, necessary costs and expenses of preserving the estate...." 11 U.S.C. § 503(b)(1)(A) (1988).

The Bankruptcy Court undertook an extensive analysis of the relevant case law before reaching its conclusion that Juniper's claims are properly classified as administrative expenses. The Court relied primarily on a Supreme Court case, *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), and on a First Circuit opinion, *In re Charlesbank Laundry*, 755 F.2d 200 (1st Cir.1985).

In *Reading*, a fire caused by the negligence of a receiver acting within the scope of his employment destroyed property in adjoining premises. Fire loss claimants filed claims for administrative expenses. The Supreme Court held that "tort claims arising during a [Chapter 11 reorganization are] actual and necessary expenses of the [reorganization]." *Reading*, 391 U.S. at 482, 88 S.Ct. at 1765. The Court found that the "decisive statutory objective" was "fairness to all persons having claims against an insolvent." *Id.* at 477. Unlike creditors who chose to do business with the debtor prior to its petitioning for bankruptcy, the fire victims "did not merely suffer injury at the hands of an insolvent business: [they had] an insolvent business

thrust upon [them] by operation of law." *Id.* at 478, 88 S.Ct. at 1763.

More than ten years after *Reading*, the First Circuit in *Charlesbank* held that a civil compensatory fine for a violation of a state court injunction imposed on the debtor, when that debtor was operating under Chapter 11, qualified for priority treatment as an administrative expense. *Charlesbank*, 755 F.2d at 202–03. The court noted:

> The debtor in this case deliberately continued a violation of law month after month presumably because it was more lucrative for the business to operate outside the zoning ordinance than within it. If fairness dictates that a tort claim based on negligence should be paid ahead of pre-organization claims, then, *a fortiori*, an intentional act which violates the law and damages others should be so treated.

*Id.* at 202.

The reasoning in *Reading* and *Charlesbank* logically compel the conclusion that Juniper's claims must be granted administrative expense priority. As the court below reasoned, "clearly, if damages leading to a negligence claim against a receiver qualify as administrative expenses then so do damages giving rise to a strict liability claim against a Chapter 11 debtor-in-possession under CERCLA." *Hemingway*, 73 B.R. at 505.

Hemingway takes issue with this analysis in several, related ways. First, it argues, Juniper's remedial efforts cannot be construed as "preserving the estate" of the debtor within the meaning of § 503(b)(1)(A), since the property had been sold and transferred to Juniper three years before the EPA issued its cleanup order. But while the costs themselves may not have materialized until years later, Hemingway's liability arose from acts and omissions that were a part of its business operations. The eventual cleanup order came about because Hemingway improperly disposed of waste on its property, and later failed to remove these drums. In addition, the sale of the Property to Juniper, out of which Hemingway's liability eventually arose, was an attempt to raise money in

order to continue business operations. That the drums were only discovered by the authorities years later does not alter the fact that their presence was a result of Hemingway's post-petition business operations. Moreover, all response cost claims under CERCLA involve some delay between the acts or omissions giving rise to liability, and the eventual cleanup order; to hold, as urged by Hemingway, would necessarily deprive all such claims of the benefit of administrative expense priority. CERCLA claims would thus receive far less favorable treatment in the bankruptcy context than do more conventional torts, a conclusion at odds with the broad remedial purposes of CERCLA, *Dedham Water Co. v. Cumberland Farms Dairy*, 805 F.2d 1074, 1081 (1st Cir.1986), and the Supreme Court's emphasis on using the administrative expense priority system to achieve a fair result, *Reading*, 391 U.S. at 477, 88 S.Ct. at 1762–63.

Next, Hemingway contends that the Bankruptcy Court misapplied *Reading* and *Charlesbank* to these facts. Hemingway first points out that both of those cases involved debtors in Chapter 11 proceedings (where the debtor is charged with the continued operation of the insolvent business entity), rather than Chapter 7 liquidation proceedings. Chapter 7, however, also mandates that administrative expenses be given priority, *see* 11 U.S.C. § 726 (1988). Moreover, neither the Bankruptcy Code nor any court has drawn a distinction between Chapter 11 and Chapter 7 in determining administrative priority. *See In re Pierce Coal & Constr.*, 65 B.R. 521 (N.D.W.Va. 1986) (any damages caused by debtor-in-possession under Chapter 11 *or* Chapter 7 trustee are entitled to administrative priority). Hemingway has failed to provide this Court with any authority mandating a difference in analysis, or with a compelling rationale for creating one.

Hemingway also argues that, since Juniper entered into the contract of sale with Hemingway "voluntarily and as a result of arms-length negotiations," it cannot be maintained that either Hemingway or the property were "thrust upon [Juniper] by operation of law." *Cf. Reading*, 391 U.S.

at 478, 88 S.Ct. at 1763. It is wrong to conclude, however, that since Juniper's response costs were the result of its knowing acquisition of property, Juniper must now meet these cleanup obligations without help. Such a position contradicts one of CERCLA's basic goals, that is, the redistribution of response costs to previous owners of property who engaged in improper waste disposal. Rather, the EPA order placed an unexpected burden on Juniper for which it was legally entitled to contribution; if Juniper is now deprived of this contribution, its burden will have been increased by operation of the bankruptcy law. This is exactly the sort of unfair situation which led the Court in *Reading* to characterize the claims of tort victims as administrative expenses.

Finally, Hemingway asserts that the First Circuit, in *In re Mammoth Mart*, 536 F.2d 950 (1st Cir.1976), endorsed a two-part inquiry for determining administrative priority, and that Juniper has failed to meet that test. In *Mammoth Mart*, former employees of a bankrupt corporation operating under Chapter 11 contended that their claims for severance pay were entitled to administrative priority. The court held that claims against a debtor-in-possession are not entitled to such priority unless the debt arises "from a transaction with the debtor-in-possession" and the bankrupt estate gained benefit from that transaction, *id.* at 954. Hemingway contends that Juniper's claim neither arose from a transaction with the trustee, nor did Hemingway gain any benefit from any such transaction.

The court in *Mammoth Mart* was faced with the prospect of giving administrative priority to claims arising in large part from pre-petition activities. That is, the employees bringing the suit had been hired before the estate entered Chapter 11, and now claimed that their claim to severance pay was purely a post-petition expense. To avoid that result, the First Circuit fashioned a test designed to limit administrative priority to those claims arising only from post-petition activity.

It is clear in the case at bar that Hemingway's liability to Juniper arose post-peti-

tion. As the court below succinctly put it, "Juniper's cause of action under CERCLA arose when the property containing the drums was transferred to Juniper or, alternatively, when Juniper expended money in response to the EPA's administrative order." *Hemingway*, 73 B.R. at 503. Hemingway therefore must rely on a semantic argument that misses the essence of what the court in *Mammoth Mart* was trying to do. Hemingway claims that, since Juniper's claims do not arise entirely from the sale of property alone, they do not arise from a "transaction" and thus cannot be accorded administrative priority under *Mammoth Mart*.

Hemingway and Juniper were engaged in a post-petition commercial relationship which promised to benefit both parties. Juniper's liability would obviously never have existed were it not for this relationship. Its claim clearly arises out of a post-petition transaction within the meaning of *Mammoth Mart*. To hold otherwise would, once again, prevent classification of any CERCLA response cost claim as an administrative expense, because no such claim arises solely from a single "transaction."

*Disallowance under § 502(e)(1)(B)*

■ Juniper contends that the court below erred in disallowing its claims for future response costs under § 502(e)(1)(B) of the Bankruptcy Code.[1] For a claim to come within this provision, (i) it must be one for reimbursement or contribution; (ii) the entity asserting the claim must be "liable with the debtor" on or have secured the claim of a creditor; and (iii) the claim must be contingent at the time of its allowance or disallowance. 11 U.S.C. § 502(e)(1)(B) (1988); *In re Wedtech Corp.*, 85 B.R. 285, 289 (S.D.N.Y.1988). The court below held

that Juniper's claim against Hemingway satisfied all three prongs. *Hemingway*, 105 B.R. at 174–78. Juniper argues that neither the second nor third requirements are met.

1. Co-liability

Juniper's first argument, simply put, is that § 502(e)(1)(B) must be read literally and applied narrowly. Appellant contends that Hemingway and Juniper are not both liable on the claim of the EPA, since the EPA has not yet filed a proof of claim against Hemingway.[2] Because the statute reads, "is liable" instead of "could be" liable "on the claim of a creditor," appellant argues, its claim should not be disallowed.

In support of its interpretation of the statute, appellants assert that the purpose of § 502(e)(1)(B), as illuminated by legislative history, is the prevention of a double payment by the debtor (here, Hemingway) on the same debt. Where there has not been a claim against the debtor by the creditor (the EPA), the argument goes, the debtor is not subjected to a dual claim, and there is no need to protect the debtor by disallowing the codebtor's claim under § 502(e)(1)(B).

■ It is true that "the legislative history concerning § 502(e) indicates that a principal purpose of the entire subsection is to prevent a double payment by the estate." *Wedtech*, 85 B.R. at 289; *see* H.R.Rep. No. 595, 95th Cong., 1st Sess. 354 (1977), U.S. Code Cong. & Admin.News 1978, p. 5787. Nevertheless, the plain language of § 502(e)(1)(B) suggests that this particular provision also serves a different purpose: to disallow contingent indemnity and contribution claims precisely because they are contingent, thereby "enabling distribution

---

1. Appellee argues that appellant Juniper, in its opposition to the motion below, failed to address the impact of § 502(e)(1)(B) on its claim against Hemingway; therefore, appellee argues, Juniper is not entitled to raise any objections to the application of that statute on appeal. The applicability of § 502(e)(1)(B) was, however, the subject of the Memorandum of Decision which Juniper now appeals. *Hemingway*, 105 B.R. at 171. Because Juniper raises objections to matters considered below, it is obviously

within this Court's discretion to entertain these arguments now.

2. Appellee points out that this argument relies on facts not presented to the court below, namely, that the EPA has not filed a proof of claim against Hemingway. Whether or not this fact may be considered on appeal, however, is of no consequence, as I hold here that the EPA is indeed a creditor of Hemingway within the meaning of § 502(e)(1)(B).

to unsecured creditors without a reserve for these types of contingent claims." *Wedtech*, 85 B.R. at 290; *see also In re Amatex Corp.*, 110 B.R. 168, 170–72 (E.D. Pa.1990). Juniper's interpretation of the statute would require both the debtor and the co-debtor (here, Juniper) to have been adjudged liable before the co-debtor's claim could be disallowed under § 502(e)(1)(B). This interpretation simply does not comport with the wording of the statute.

■ Under CERCLA, Hemingway is potentially liable to the EPA for "all costs of removal or remedial action incurred by the United States Government ... not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(2)(A) (1988). Indeed, the EPA has named both Juniper and Hemingway as potentially responsible parties. The EPA is therefore a creditor of Hemingway within the meaning of § 502(e)(1)(B), even assuming it has not yet filed a proof of claim against Hemingway.

### 2. Contingency of the Claim

■ Juniper also claims that § 502(e)(1)(B) is not applicable here because its claim against Hemingway for future response costs is not "contingent" within the meaning of that statute. The court below was unconvinced by Juniper's argument:

> [T]he contingency of Juniper's claim for future response costs is obvious. With respect to obligations stemming from the administrative order, Juniper states in its complaint that it is awaiting "further orders for a possible future clean up...." With respect to costs of remediating the Wells G & H Site, any claim that Juniper would have would be contingent upon the United States commencing and prevailing in an enforcement action

under CERCLA or Juniper's involvement in performing or financing cleanup work at the site.

*Hemingway*, 105 B.R. at 178.

Under § 502(e)(1)(B), the claim of a surety or co-debtor is contingent until the claimant "pays the principal creditor and thereby fixes his own right to payment from the debtor." 3 *Collier on Bankruptcy* ¶ 502.05, at 502–88 (15th ed. 1990). Obviously, Juniper has not yet incurred any future response costs; nor has it been adjudged liable in an appropriate CERCLA enforcement action. Therefore, Juniper cannot yet be said to have fixed its own right of payment against Hemingway. Although Juniper has been named by the EPA as a "Potentially Responsible Party," this type of agency notice letter is not definitive on the question of liability. *Pacific Resins & Chems. v. United States*, 654 F.Supp. 249 (W.D.Wash.1986). Juniper's claim against Hemingway for future response costs is therefore contingent within the meaning of § 502(e)(1)(B).

Accordingly, the decision of the court below with respect to the disallowance of Juniper's claim under § 502(e)(1)(B) is affirmed.

### Response Costs

Appellant Juniper next appeals the bankruptcy court's ruling on December 18, 1989, that attorney's fees, prejudgment interest and other costs are not recoverable as response costs in a private party action under § 107(a)(2)(B) of CERCLA, 42 U.S.C. § 9607(a)(2)(B) (1988).

Since CERCLA does not define "response costs,"[3] the issue is one of statutory interpretation.

---

**3.** While it does not precisely define the phrase "necessary response costs," CERCLA does provide that "response" means "remove, removal, remedy and remedial action ... includ[ing] enforcement activities related thereto." 42 U.S.C. § 9601(25) (1988). "Remove" and "removal" are defined as:

> [T]he cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous

substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23) (1988) (footnote omitted).

### 1. Attorney's Fees

The courts that have addressed the question of whether attorney's fees are necessary response costs under CERCLA have not reached consensus. *See, e.g., General Elec. Co. v. Litton Industrial Automation Systems,* 920 F.2d 1415 (8th Cir. 1990) (private party can recover attorney's fees under CERCLA); *Pease & Curren Ref., Inc. v. Spectrolab, Inc.,* 744 F.Supp. 945 (C.D.Cal.1990) (same); *Shapiro v. Alexanderson,* 741 F.Supp. 472 (S.D.N.Y. 1990) (attorney's fees recoverable for proper response activities); *cf. Fallowfield v. Strunk,* No. 89 Civ. 8644, 1990 WL 52745 (E.D.Pa. April 23, 1990) (attorney's fees not recoverable); *Mesiti v. Microdot,* 739 F.Supp. 57 (D.N.H.1990) (same); *T & E Indus. v. Safety Light Corp.,* 680 F.Supp. 696 (D.N.J.1988) (same).

A careful review of the statute persuades me that the costs of litigation are not recoverable by a private litigant. I start with the general principle that "[A]bsent explicit Congressional authorization, attorneys' fees are not a recoverable cost of litigation." *Runyon v. McCrary,* 427 U.S. 160, 185, 96 S.Ct. 2586, 2602, 49 L.Ed.2d 415 (1976). CERCLA provides no such explicit authorization. The statute elsewhere specifically provides that the *government* can recover legal costs, 42 U.S.C. § 9604(b) (1988), but fails to extend that right to private parties. Nor can private litigation expenses be considered recoverable "enforcement activity" within the meaning of the statute; while "plaintiffs may bring an action for recovery of response costs, they may not bring an action to enforce CERCLA's cleanup provisions against another private entity." *T & E,* 680 F.Supp. at 708 n. 13. Accordingly, plaintiffs are not entitled to recover attorney's fees that were incurred to pursue this litigation. *See also Regan v. Cherry Corp.,* 706 F.Supp. 145, 149 (D.R.I.1989) (discussing Congress' failure to amend § 9607 to allow reimbursement of attorneys' fees in response cost suits).

### 2. Labor Costs

Juniper next argues that the Bankruptcy Court improperly excluded the value of the time of Juniper's personnel from its determination of recoverable response costs. Specifically, it suggests that the cost to Juniper of the time and effort spent on the problem by Mr. Charles Whitton, General Partner of Juniper, should have been part of the award.

Nothing in the statutory language of CERCLA indicates that employee time should be considered a cost of response. Rather, employees must be paid whether or not they have spent their time addressing waste cleanup efforts; these costs are not made necessary by the improper disposal of wastes. To interpret CERCLA to require reimbursement of employee time and effort would, in effect, compensate CERCLA plaintiffs for lost employee productivity. But CERCLA was never intended to provide for the recovery of business losses. *Artesian Water Co. v. Gov't of New Castle County,* 659 F.Supp. 1269, 1287 (D.Del. 1987).

At the evidentiary hearing on October 17, the bankruptcy judge excluded testimony by Mr. Whitton regarding the value of his own efforts to address the waste problem. Because time spent on cleanup efforts is nothing more than a cost of doing business, I affirm that ruling. *But see T & E,* 680 F.Supp. at 706–07 (employee time spent in cleanup effort recoverable as response cost).

### 3. Prejudgment Interest

The Bankruptcy Court did not include prejudgment interest in its determination of Juniper's recoverable response costs in its decision of December 18, 1989. *Hemingway,* 108 B.R. at 383–84. Once again, defendant objects to the omission, and once again, CERCLA does not specifically address the issue.

In the absence of legislative provision, the Supreme Court has directed that the decision to grant or deny prejudgment interest should hinge on whether to do so would further the congressional purposes underlying the obligations imposed by the statute in question. *Rodgers v. United States,* 332 U.S. 371, 373, 68 S.Ct. 5, 6–7, 92

L.Ed. 3 (1947). CERCLA has been described as "a remedial statute designed by Congress to protect and preserve public health and the environment.... [I]ts provisions [should therefore be] construed liberally to avoid frustration of the beneficial legislative purposes." *Dedham*, 805 F.2d at 1081. At least two district courts have imposed prejudgment interest under CERCLA in private party suits. *General Elec. Co. v. Litton Business Sys.*, 715 F.Supp. 949, 959 (W.D.Mo.1989); *United States v. Northeastern Pharmaceutical & Chem. Co.*, 579 F.Supp. 823, 852 (W.D.Mo. 1984). It is clear, then, that prejudgment interest is available under CERCLA.

In general, without statutory direction, the granting of prejudgment interest lies within the discretion of the trial court. *Whitfield v. Lindemann*, 853 F.2d 1298, 1306 (5th Cir.1988). Such interest should be "given in response to considerations of fairness." *Blau v. Lehrman*, 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962). The fact that the Bankruptcy Court declined without comment to award prejudgment interest makes it difficult to weigh the propriety of the exercise of discretion in this case. *Whitfield*, 853 F.2d at 1306. This issue, therefore, is remanded to the Bankruptcy Court to consider the matter of prejudgment interest.

*Conclusion*

For the reasons stated, the decision of the court below granting administrative expense priority to Juniper's claims is affirmed, as is its decision to disallow Juniper's claims for future response costs under 11 U.S.C. § 502(e)(1)(B). The decisions not to award attorney's fees to Juniper and to exclude evidence of Juniper's labor costs from its calculation of recoverable response costs are also affirmed.

The case is remanded to the Bankruptcy Court to consider whether prejudgment interest on the award to Juniper is appropriate, and if so, to determine the proper amount of that interest.