In re HEMINGWAY TRANSPORT, INC.,
Bristol Terminals, Inc., Debtors.

JUNIPER DEVELOPMENT GROUP,
et al., Plaintiffs,

v.

Herbert C. KAHN, Chapter
7 Trustee, Defendant.

Bankruptcy Nos. 82–1340–
JNF, 82–1341–JNF.
Adv. No. 86–1081.

United States Bankruptcy Court,
D. Massachusetts.

Nov. 1, 1994.

Martin P. Desmery, Craig & Macauley, Boston, MA, for sp. counsel to Chapter 7 Trustee.

Louis N. Massery, Cooley, Manion, Moore & Jones, Boston, MA, for Juniper Development Group and Trustees of Olympia Nominee Trust.

Jillian Aylward, Boston, MA.

Jon D. Schneider, Boston, MA.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

### I. BACKGROUND

On July 28, 1982, Hemingway Transport, Inc. ("Hemingway") and its wholly owned subsidiary, Bristol Terminals, Inc. ("Bristol") (collectively, the "Debtors"), filed voluntary petitions under Chapter 11 of the Bankruptcy Code. The Chapter 11 cases were converted to cases under Chapter 7 in November of 1983. After notice and a hearing, in April of 1987, the two Chapter 7 estates were substantively consolidated. Prior to its conversion to Chapter 7, Bristol sold property located at 60 Olympia Avenue, Woburn, Massachusetts to Juniper Development Group, a general partnership. The court authorized sale of the Olympia Avenue property engendered protracted litigation and appellate review. The matters now before this Court on remand from the United States Court of Appeals for the First Circuit are: 1) the allowance of the proof of claim filed in the Chapter 7 cases on behalf of "Juniper Development Group, George D. Whitten, Amy Whitten and Charles D. Whitten as Trustees of 60 Olympia Nominee Trust" (collectively "Juniper") through which Juniper seeks anticipated response costs associated with the

contamination of the 60 Olympia Avenue property with hazardous wastes; and 2) Juniper's adversary complaint against the Chapter 7 Trustee in which it originally sought contribution from the bankruptcy estates for past and future cleanup costs (Count I), damages for breach of contract (Count II), and rescission of the sale (Count III).

In an opinion dated May 8, 1987, the bankruptcy court granted the Chapter 7 Trustee partial summary judgment with respect to Juniper's three count complaint. Specifically, the court granted the Trustee summary judgment on both Count II in which Juniper alleged breach of warranty and on Count III in which Juniper sought equitable rescission of the purchase and sale agreement pursuant to which it acquired the Olympia Avenue property. *See In re Hemingway Transp., Inc.*, 73 B.R. 494 (Bankr.D.Mass.1987). In the same decision, the bankruptcy court denied the Trustee's motion for summary judgment with respect to Juniper's claim under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), 42 U.S.C. §§ 9601–9657 (1988), and directed Juniper to amend its complaint.

In a subsequent opinion, the bankruptcy court disallowed Juniper's claim for future response costs pursuant to 11 U.S.C. § 502(e)(1)(B) on the ground that it was a contingent contribution claim under CERCLA for which Juniper and the Debtors were jointly and severally liable to the United States Environmental Protection Agency (the "EPA"). *In re Hemingway Transp., Inc.*, 105 B.R. 171 (Bankr.D.Mass.1989). However, the court allowed Juniper's administrative expense claim for past response costs in the sum of $38,763.00, although it denied Juniper's additional claim for attorneys' fees. *In*

re Hemingway Transp., Inc., 108 B.R. 378 (Bankr.D.Mass.1989). The district court affirmed, except with respect to the matter of prejudgment interest on Juniper's recoverable response costs. *In re Hemingway Transp., Inc.*, 126 B.R. 650, 664 (D.Mass. 1991).

On appeal, the United States Court of Appeals for the First Circuit affirmed the orders disallowing attorneys' fees and allowing the claim for past response costs as an administrative expense. However, the court of appeals vacated the order disallowing Juniper's claim for future response costs and remanded the matter to the bankruptcy court for further proceedings. *In re Hemingway Transp., Inc.*, 993 F.2d 915 (1st Cir. 1993).

The court of appeals began its discussion by noting that "[t]here can be little doubt that, but for section 502(e)(1)(B), the Hemingway–Bristol estate would share some measure of financial responsibility for the anticipated $6.2 million in future response costs on which the Juniper claim is based." *Id.* at 922.[1] However, it added that "sometimes the fundamental policy embodied in Bankruptcy Code § 502(e)(1)(B) may promote an expeditious administration of the chapter 7 estate, at the expense of a fundamental CERCLA policy: the equitable allocation of environmental cleanup costs among all responsible parties." *Id.* at 924 (citation omitted). Despite these conflicting policies, the court could "discern no inherent incompatibility between section 502(e)(1)(B) and the congressional policies underlying CERCLA such as might enable a court reasonably to conclude that Congress implicitly exempted CERCLA co-obligation claims" from disallowance under section 502(e)(1)(B). *Id.*

Turning to the question of the allocation of the burden of proof with respect to a section 502(e)(1)(b) objection to a proof of claim, the court stated that "the chapter 7 trustee was

---

1. Section 502(e)(1)(B) of the Bankruptcy Code provides in relevant part the following:

 (e)(1) *Notwithstanding subsections (a), (b) and (c) of this section and paragraph (2) of this subsection, the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that—* ...

 (B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution.... 
 11 U.S.C. § 502(e)(1)(B).

required to come forward with substantial evidence that Juniper's claim is one for CERCLA 'contribution' which would implicate two related questions: (1) whether Hemingway–Bristol is contingently 'liable' to the EPA for future response costs, and (2) whether Juniper is 'liable' to the EPA on the same 'debt.'" *Id.* at 925. Observing that the bankruptcy court had determined that Hemingway–Bristol is a "covered person," strictly liable to the EPA for future response costs pursuant to 42 U.S.C. § 9607(a)(4)(A),[2] the court turned its focus to the issue of Juniper's liability *with* the Debtors on the EPA's claim against them. First it reasoned that the harsh results of section 502(e)(1)(B) could be mitigated by requiring the Chapter 7 Trustee to file "a surrogate claim in [sic] behalf of the EPA as a precondition to obtaining simultaneous disallowance of Juniper's contingent claim under section 502(e)(1)(B))." *Id.* at 927. Additionally, according to the court, such a requirement "might permit allowance of a non-fixed co-debtor claim for CERCLA contribution if the creditor [the EPA] were *foreclosed* from participating in any distribution from the estate under Bankruptcy Code section 726(a)." *Id.* at 926. Moreover, it observed that Juniper could also file a surrogate claim on behalf of the EPA in which case it would simply be required to show that the EPA's debt would be diminished by the amount of any distribution to the EPA on the surrogate claim. *Id.* at 927.

In vacating the bankruptcy court order disallowing Juniper's claim under section 502(e)(1)(B), the court stated:

> Although disallowance of Juniper's CERCLA claim under section 502(e)(1)(B) is not strictly foreclosed by EPA's failure to file timely proof of its claim, we cannot overlook the fact that the trustee's reliance on section 502(e)(1)(B) may occasion a pointless financial loss to Juniper and result in a windfall to the chapter 7 estate, notwithstanding Juniper's best efforts to induce EPA to file its claim.... [R]esort to subsections 501(b) and (c) would not compel EPA's participation in the bankruptcy proceedings, but nevertheless would compel a set-aside for EPA's benefit at the time of distribution regardless of its decision to refrain from filing a claim against the chapter 7 estate. The distribution to EPA would result in a reduction in the total indebtedness to EPA for which Juniper and the chapter 7 estate are alleged to be co-liable.

*Id.* at 928.

The court of appeals directed this Court to prescribe a bar date by which the Chapter 7 Trustee was to elect whether to file a surrogate EPA claim pursuant to 11 U.S.C. § 501(c), or in the alternative, by which Juniper could file its own surrogate claim on behalf of the EPA for future response costs against the estate.[3] *Id.*

---

2. Section 9607(a) of CERCLA delineates four categories of "covered persons" as follows:

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which

causes the incurrence of response costs, of a hazardous substance....

42 U.S.C. § 9607(a). The owner or operator of a facility at the time disposal (a "covered person" pursuant to § 9607(a)(2)) shall be liable for among other things "any other necessary costs of response incurred by any other person consistent with the national contingency plan." *Id.* § 9607(a)(2)(B). "[A]ny other person" can be a neighboring landowner, not necessarily a "covered person." *See* 993 F.2d at 931.

3. The court also indicated that if neither the trustee nor Juniper filed a surrogate claim, the section 502(e)(1)(B) objection should be dismissed and Juniper's direct claim against the estate estimated pursuant to the normal claim-allowance procedures, perhaps because the Chapter 7 Trustee would have failed to produce sufficient evidence of the existence of a right to payment on the part of the EPA. 993 F.2d at 928.

153

The court, on the assumption that the Trustee would in fact file a surrogate proof of claim, outlined the standards governing consideration of the proof of claim. It stated:

Juniper's priority 'claim for reimbursement or contribution' would be allowable if either: (1) Juniper and the chapter 11 estate are not strictly, jointly, and severally liable ("liable with the debtor") on the EPA debt under the liability provisions of the CERCLA statute, or (2) Juniper's response costs have become "fixed" and "actual" (i.e. have been expended by Juniper for remediation or paid over to the EPA) by the time Juniper's claim is considered for disallowance. As Juniper's contingent claim for future response costs is, by definition, not "fixed," Juniper cannot escape the consequences of section 502(e)(1)(B) unless it is not strictly and jointly "liable" with Hemingway–Bristol on the EPA debt.

Id. at 930 (citation omitted).[4] Although the court indicated that the threshold issue was whether Juniper's CERCLA claim was a direct claim under section 9607(a) or a derivative claim for contribution under section 9613(f)[5], the court noted that "in the event the private-action plaintiff itself is potentially 'liable' to the EPA for response costs, and thus is akin to a joint 'tortfeasor,' section 9607(a)(4)(B) serves as the *pre-enforcement* analog to the 'impleader' contribution action permitted under section 9613(f)." Id. at 931. Thus, the court stated that

[g]iven the comparative breadth of the section 9607(a)(4)(B) remedy, and Juniper's explicit allegation that it had no actual or constructive knowledge of the contamination at the time it purchased the facility, we think the trustee must come forward with substantial evidence from which the bankruptcy court could conclude that Juniper is a "covered person" liable to the EPA for future response costs.

Id. at 932 n. 22. The court observed that not all "covered persons" are strictly liable for response costs as "[s]ection 9607(b)(3) would afford a complete defense to CERCLA liability if Juniper were to establish that (1) it acquired the facility after the initial deposit of the hazardous substances; and (2) at the time of its acquisition, it did not know and had *"no reason to know"* that any hazardous substance was deposited at the facility; and (3) once the presence of the hazardous substance became known, Juniper exercised due care in the circumstances." Id. at 932. See also 42 U.S.C. § 9607(b).[6] Thus, the court

4. However, the court implied that if the EPA was foreclosed from participating in any distribution from the estate, Juniper would no longer be liable with the Debtors to the EPA (or alternatively, Juniper's debt to the EPA would no longer be contingent), thereby eliminating section 502(e)(1)(B) as a mechanism by which the Trustee could avoid Juniper's claim for future response costs in its totality. This construction permits reconciliation of the court's dismissal of the 502(e)(1)(B) objection in the event that neither the Trustee nor Juniper filed a surrogate proof of claim, 993 F.2d at 928, with the statement that "[a]s Juniper's contingent claim for future response costs is, by definition, not 'fixed,' Juniper cannot escape the consequences of section 502(e)(1)(B) if it is not strictly 'liable' with Hemingway–Bristol on the EPA debt," id. at 930 and the court's subsequent ruling that if Juniper cannot establish the innocent landowner defense its claim must be fixed pursuant to section 502(e)(2), id. at 934.

5. Section 9613(f) of CERCLA provides in relevant part the following:

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 or section 9607 of this title.

42 U.S.C. § 9613(f)(1).

6. Section 9607(b) provides in relevant part the following:

There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—
(1) an act of God;
(2) an act of war;
(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in

ruled that "under *either* section 501(e)(1)(B) or section 503(a), Juniper's participation in any distribution from the chapter 7 estate hinges entirely on the validity of its 'innocent landowner' defense." *Id.* at 933. The court observed that the record contained mixed signals on the 'innocent landowner' defense:

> In a May 19, 1987 letter to Juniper, the EPA opined that Juniper would not be entitled to the "innocent landowner" defense, for several reasons: Juniper (1) knew in 1983 that the facility was in close proximity (200) feet to a larger Superfund site already included on the national priority list; (2) made no preacquisition inquiry of EPA or DEQE concerning possible contamination in the area; and (3) did not obtain available maps showing an unpaved access road to the allegedly inaccessible portion of the facility · where the drums were found.
>
> The EPA opinion is not necessarily dispositive as to the allowability of a claim or an administrative expense request. Nevertheless, after trial on the issue of Hemingway's liability for past response costs, the bankruptcy court noted (notwithstanding Juniper's contention that the drums were located in an area which was inaccessible at the time of the 1983 sale) that "*easy access* to the location of the barrels is possible along the City of Woburn's sewer easement, which parallels the

MBTA tracks." The record further suggests that Juniper, an experienced land developer in the Woburn area, may have been familiar with the environmental risks posed by the acquisition of the facility, and therefore may have been cognizant that the $1.6 million purchase price reflected a discount due to contamination.

> On the other hand, the record indicates that the bankruptcy court may have considered Juniper's responsibility for any contamination extremely minimal, especially in comparison to Hemingway–Bristol. For example, in allowing Juniper's contribution claims for *past* response costs, the bankruptcy court allocated *total* financial responsibility to Hemingway–Bristol ... despite the fact that the court also found no evidence that Hemingway–Bristol, throughout twenty years' occupancy, ever generated or deposited hazardous wastes at the facility. The bankruptcy court further found that Juniper was never "apprised of the presence of hazardous wastes...." And, of course discount prices are not uncommon in forced sales of the assets of insolvent estates.

*Id.* at 933 (citations omitted). Accordingly, the court of appeals directed that this Court determine whether Juniper made "all appropriate" preacquisition inquiry pursuant to 42 U.S.C. § 9601(35).[7] In addition, the court of appeals gave the following instructions:

> connection with a contractual relationship, existing directly or indirectly, with the defendant ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or (4) any combination of the foregoing paragraphs.
> 42 U.S.C. § 9607(b).

**7.** For purposes of section 9607(b), section 9601(35)(A) defines the term contractual relationship to include, but not be limited to, the following:

> land contracts, deeds or other instruments transferring title or possession, unless the real property on which the facility concerned is

> located was acquired by the defendant after the disposal or placement of the hazardous substance on, in, or at the facility, and one or more of the circumstances described in clause (i), (ii), or (iii) is also established by the defendant by a preponderance of the evidence:
> > (i) At the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility....
> > (ii) The defendant is a government entity which acquired the facility by escheat, or through any other involuntary transfer or acquisition, or through the exercise of eminent domain authority by purchase or condemnation.
> > (iii) The defendant acquired the facility by inheritance or bequest.
> In addition to establishing the foregoing, the defendant must establish that he has satisfied the requirements of section 9607(b)(3)(a) and (b) of this title.

[S]hould the bankruptcy court find that Juniper did not have notice or actual knowledge of the contamination at the time it purchased the facility in 1983, Juniper's claim for past and future response costs should be estimated and allowed as administrative expenses entitled to priority. On the other hand, if Juniper did not take all appropriate steps to protect itself from CERCLA liability, its lack of diligence exposed it to the harsh consequences of strict, joint and several liability under CERCLA. In that event, Juniper's claim would be subject to the section 502(e)(2) 'fixing' requirement and Juniper would not be entitled to administrative expense priority with respect to any allowable CERCLA claim.

*Id.* at 934 (footnote omitted). Additionally, the court stated with respect to Juniper's establishing the "innocent landowner" defense the following: "[a]s an acquiring party and an owner of the facility during a period of 'passive' disposal Juniper would be held to an especially stringent level of preacquisition inquiry-on the theory that an acquiring party's failure to make adequate inquiry may itself contribute to a prolongation of the contamination." *Id.* at 933 (footnote omitted).

In accordance with the instructions of the court of appeals, this Court established a bar date, and the Chapter 7 Trustee timely filed a surrogate EPA claim. Juniper also filed a direct claim,[8] to which the Chapter 7 Trustee objected. The Court bifurcated the issues on remand and held a trial on the "innocent landowner" defense asserted by Juniper. The parties requested that the Court view the Olympia Avenue property, which was

done on April 4, 1994. With the consent of both parties, the Court viewed the property again on October 17, 1994. A two day evidentiary hearing was held on June 22 and 23, 1994 at which thirteen witnesses testified and thirty-one exhibits were introduced. Both parties submitted post-trial briefs. Based upon the testimony and documentary evidence, and, where appropriate, the previous record in these cases, the Court makes the following findings of fact and conclusions of law as required by Fed.R.Bank.P. 7052.

## II. FINDINGS OF FACT

### A. *Characteristics of the Olympia Avenue Property*

The property that is the subject of this litigation is a 21.4 acre parcel of real estate located at 60 Olympia Avenue in Woburn, Massachusetts (the "property"). Bristol purchased the property on July 29, 1980, but its affiliate, Hemingway, had been leasing the property prior to that time. On May 15, 1983, Bristol sold the property, with the approval of the bankruptcy court, to Juniper Development Group, a partnership whose general partners at the time were George Whitten ("Mr. Whitten"), his son, Charles Whitten, his daughter, Amy Whitten (collectively the "Whittens"), and his stepson, Robert P. Miller, Jr. On March 6, 1985, the general partners of Juniper deeded the property for $1.00 to George Whitten, Charles Whitten and Amy Whitten, as trustees of the Olympia Nominee Trust, whose sole beneficiary is Juniper Development Group. Mr. Whitten testified that either tax reasons or

42 U.S.C. § 9601(35)(A). Subsection 9601(35)(B) elaborates as follows:

To establish that the defendant had no reason to know ... the defendant must have undertaken, at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial and customary practice in an effort to minimize liability. For purposes of the preceding sentence the court shall take into account any specialized knowledge or experience on the part of the defendant, the relationship of the purchase price to the value of the property if uncontaminated, commonly known or reasonably ascertainable information about the property, the obviousness of the presence or likely presence of contamination at the proper-

ty, and the ability to detect such contamination by appropriate inspection.

*Id.* § 9601(35)(B).

8. In its proof of claim, Juniper stated the following:

This proof of claim amends all previous claims filed by the Creditors and seeks allowance of a direct claim against the Debtors for payments of an administrative expense incurred and to be incurred on the Debtors' behalf at 60 Olympia Avenue for the clean-up of the site pursuant to ... [CERCLA]. Creditors maintain that their claim is an unsecured priority claim entitled to administrative priority pursuant to the aforementioned decision of the U.S. Circuit Court of Appeals.

Robert P. Miller's departure as a partner in Juniper motivated the transfer.

The property is composed of two lots. Lot 1, a 6.6 acre rectangular parcel on the northeast portion of the property, contains a large truck terminal and associated industrial structures and is enclosed by a chain link fence. The truck terminal portion of the property is largely filled land. This portion of the property has been the site of a trucking terminal for the past thirty years. Lot 1 is bordered by Olympia Avenue and the Aberjona River on the north and west sides, respectively. The Aberjona River flows through a conduit under Olympia Avenue and on the western side of Lot 1.

Lot 2 contains approximately fourteen acres of undeveloped land abutting Lot 1 in a reverse L-shaped formation. The Aberjona River, which at the southeast corner of Lot 1 exits the conduit, assumes a serpentine configuration as it flows in a southerly direction through Lot 2. Lot 2 also contains swampland, overgrown vegetation, bushes, eight foot high reeds, and some deciduous trees. As wetlands, it is unsuitable for development under Massachusetts law. There has never been any commercial activity conducted on Lot 2.

Lot 2 is bordered along its western boundary by the Boston & Maine ("B & M") railroad tracks which are elevated approximately five feet from the surrounding land. Parallel to the railroad tracks, running down the length of the property, is a path, which, at least at the present time, is approximately 2 to 3 feet wide, under which the town sewer line is located. The path can be walked from Salem Street to Olympia Avenue, although it is partially overgrown with vegetation. The path does not permit vehicle access to the property because of conduits channeling water under the railroad tracks.

The rear portion of Lot 2 is only accessible from Lot 1 by crossing the Aberjona River conduit that runs under Olympia Avenue at the front portion of Lot 1 and following the sewer line path alongside the railroad tracks. The plot plan to the property does not reflect that the path is a conventional road or walkway. Teenagers and children using minibikes along the path have been observed on Lot 2. According to William Cashins ("Cashins"), an agent of the Department of Environmental Protection (the "DEP"), formerly known as the Massachusetts Department of Environmental Quality Engineering (the "DEQE"), a vehicle can be driven along the sewer path from Salem Street to within 20 feet of the rear of the property, at which point a small brook interrupts the path. (Cashins walked the path in 1981 and described the existence of a brook in his testimony. The Court observed the existence of culverts which, like the brook, impede vehicular traffic.)

During the trial, several aerial photographs were introduced into evidence, including a color photograph taken in the early 1970s in the fall and a black and white photograph taken in March of 1981. In both of these photographs, industrial debris, which is still present on Lot 2, can be observed along the sewer easement. The path, at those times, appears to have been wider and more heavily utilized than it is today, as conduits and a fence may have curtailed movement of all but a limited amount of foot and bicycle traffic between Olympia Avenue and Salem Street. Indeed, the path was considerably overgrown at the time of the Court's October view, more so than when the Court toured the property in the spring of 1994 shortly after a brush fire had blackened large areas of Lot 2.

Olympia Avenue, which runs east to west from Mishawum Road to Washington Street, is in the heart of an industrial area filled with warehouses and manufacturing facilities. To the immediate west of the property is a rifle range. The adjacent property to the south is owned by the City of Woburn, is comprised of wetlands like Lot 2, and is the site of two closed water wells, Wells G and H, located 200 feet from the property. Properties owned by Beatrice Foods Company and/or John J. Riley Company, a leather tannery, Aberjona Auto Parts, Inc., a junkyard, and Whitney Barrel Company, a manufacturer and reconditioner of barrels, also are located immediately south of the property. Diagonally across Olympia Avenue to the northeast are buildings owned by Cummings Proper-

ties and Unifirst Corporation, also known as Interstate Uniform.

### B. The City of Woburn and Its Hazardous Waste Problems

Beginning in late 1979 and during the early 1980s, the City of Woburn (the "City") received considerable media attention, both local and nationwide, concerning its problems with hazardous waste contamination—in particular, the contamination of its water supply and high childhood leukemia rates. Because of suspected contamination of the City's drinking water, Wells G and H were tested, found to contain hazardous substances, and shut down in 1979.

In April of 1979, the City's newspapers reported that 200 drums were dumped near the MBTA train station next to the Aberjona River. In August of 1980, a Woburn newspaper reported that 50 to 60 barrels were dumped along the dirt road next to the railroad tracks between Olympia Avenue and Salem Street. The Chapter 7 Trustee was unable to establish that the Hemingway property was the actual site of the dumpings reported in the local newspapers or that Juniper knew about the presence of barrels prior to its acquisition of the property.

Wells G and H were designated CERCLA Superfund sites in December 1982. According to Gretchen Latowsky ("Latowsky"), a citizen activist and the current director of the group "For A Cleaner Environment" ("FACE"), the Industri-plex site, another Superfund site located approximately one and one-half miles north of the Hemingway property, is contaminated with a variety of hazardous substances, including arsenic pools, chromium lagoons and buried animal hides. It was named an EPA Superfund site in 1981. The Aberjona River runs through the Industri-plex site.

Woburn's significant hazardous waste problems precipitated the formation of FACE in the early 1980s to gather data, increase public awareness, and to effect political solutions with respect to Woburn's hazardous waste problems, in particular the high leukemia rates. Ms. Latowsky, testified that FACE has a file on 60 Olympia Avenue, but its contents, other than two newspaper articles, were not produced or described at trial.

In the early 1980s, the EPA commissioned an environmental consultant, Ecology & Environment, Inc. ("E & E"), to study the hydrogeology of the City's ground water. Its five reports, prepared in 1981 and 1982, were issued to citizens' advisory groups and to political officials. The reports contained findings of a wide variety of contaminants in North and East Woburn. There was no live testimony that the Whittens received or knew about these reports. However, in the "Field Investigations of Uncontrolled Hazardous Waste Sites" prepared by E & E and dated January 9, 1991, George Whitten is identified as having been contacted by telephone on November 13, 1980 by E & E personnel with respect to the existence of a production well on property, which was owned by Mystic Builders Supply (a company in which he was a principal) and located on Wildwood Street, a street intersecting Olympia Avenue west of the Hemingway property. E & E found that there were a wide variety of contaminants in the Woburn groundwater, including such hazardous chemicals as tetrachloroethylene, trichloroethylene, toluene, xylene, freon, and tetrahydrofuran. E & E also identified 26 sites in its groundwater investigation, including a possible site of midnight dumping of barrels along an "unpaved road" next to the railroad tracks, as a possible source of the contamination of Wells G & H, as well as several properties located along Salem Street, south of the Olympia Avenue property, belonging to John J. Riley Company and/or Beatrice Foods Company, Aberjona Auto Parts, Inc. and others.

In 1982, numerous victims of leukemia filed a civil action against several Woburn companies, namely, W.R. Grace & Company, Beatrice Foods Company and Unifirst Corporation. The plaintiffs alleged that the defendants were liable for contaminating the City's water supply and causing their illnesses.[9] The lawsuit received a great deal of

---

9. In Anderson v. Cryovac, Inc., 862 F.2d 910 (1st Cir.1988), the United States Court of Appeals for the First Circuit in considering an appeal from the denial of a motion for relief from judgment,

publicity. Neither Hemingway nor Bristol was a named defendant. After a verdict for the defendants and an appeal from the denial of a motion for relief from judgment, the lawsuit was resolved by settlement in 1986.

In 1983, the cause of the high leukemia rates in the City was not certain, although it was suspected that water from Wells G & H was the cause. Ms. Latowsky testified that the Olympia Avenue property was located in an area known to be "environmentally sensitive" in 1983 and that the vicinity of the property had a reputation for abandoned drums.

In the spring of 1983, the EPA issued administrative orders to W.R. Grace, Beatrice Foods, and Interstate Uniform. Neither the Debtor nor Juniper were the subject of an EPA administrative order in 1983.

### C. The Hemingway Property and Hazardous Waste Reports

In a Memorandum dated February 20, 1971 from the City of Woburn's Health Inspector to the Board of Health, the Health Inspector reported that certain fiber and steel drums were disposed of along the railroad tracks near Olympia Avenue and that he was unable to determine the identity of the owner of the land. In this memorandum, the Health Inspector opined that Whitney Barrel Company had deposited the drums along the tracks and confirmed that Mr. John Whitney of Whitney Barrel had agreed to remove the barrels.

On August 15, 1980, a DEQE employee, William Cashins, inspected the property from the path and found 17 barrels, many of which contained an oil or tar-like substance, approximately five yards from the railroad tracks in the southwest corner of the property. After investigating the ownership of the property, the DEQE's Eastern Regional En-gineer contacted Hemingway in October of 1980, requiring it to remove the barrels. In the meantime, on August 8, 1980, Thomas Mernin ("Mernin"), the City Engineer and soon to be hazardous waste coordinator, complained to the DEQE about the existence of the barrels. The DEQE agent conducting the investigation pursuant to Mernin's request, Brian Kelleher, reported the following:

> There is a pile of about a dozen 55 gallon drums located in the southwest corner of the property. Some of the drums are empty and others contain a solid grease like chemical waste. These drums appear to have been there a long time.
>
> Close by the pile there is a tar like oil residue on the ground.
>
> There is presently no motor vehicle access to this area.

Agent Kelleher also reported that the type of drums found on the Hemingway property were the same as those found on the Riley Tannery property. He recommended that the City request the DEQE to order John J. Riley Company and Hemingway to remove the drums, and conduct tests on the water and soil.

Cashins inspected the property again in February and in April of 1981 and found that the barrels were still there. By Memorandum dated November 1, 1982, Cashins asked that his supervisor request legal assistance from the Attorney General's Office with respect to the removal of the barrels. Cashins did not know whether the assistance was requested by his supervisors, and he did not follow up on the request because in November of 1982 the matter was transferred to DEQE's new division, "Incident Response." Cashins testified that he did not believe the barrels had to be removed immediately because they did not appear to be releasing any substances.[10]

noted that the leukemia victims personal injury suit focused on several potential sources of contamination, including a "15–acre parcel of vacant wetland lying west and southwest of the wells." *Id.* at 913. This parcel was bordered by the Aberjona River, the railroad embankment and the Hemingway property and was owned between 1978 and 1983 by Beatrice Foods Company. According to the court, Beatrice resold the main tannery to John J. Riley Company, while transferring the 15 acre wetland parcel "to an entity bearing the elegant name 'Wildwood Conservation Corporation.'" *Id.* Wildwood was controlled by Riley. *Id.*

10. Mernin shared his assessment. In his August 8, 1980 letter to the DEQE, he stated that "[f]rankly, I do not consider this a big problem...."

### D. *The Sale of the Hemingway Property*

The Debtors filed voluntary Chapter 11 petitions in July of 1982. By order of the bankruptcy court, the Debtors were authorized to employ Stephen Frohn ("Frohn") of Coldwell Banker to broker the sale of the property. Mr. Frohn gained experience in the Woburn commercial and industrial real estate market as an employee of Cummings Properties, which owned numerous commercial properties in Woburn. Although Frohn was aware of Woburn's problems with hazardous waste, he was unaware of any hazardous waste contamination of the Hemingway property. He showed the property to prospective purchasers on several occasions. No interested party expressed any interest in walking or otherwise inspecting Lot 2 or asked permission to do so from either Mr. Frohn or Hemingway personnel.

Mr. Frohn contacted George Whitten about the availability of the property, and Mr. Whitten visited it on one or two occasions in the winter of 1983. He inspected the exterior and interior of the truck terminal and reviewed a plot plan. Mr. Whitten inquired of the Debtors' representatives whether they transported hazardous waste and was told by the representatives that they did not. He asked about the underground fuel storage tanks and was told they were in good condition.

Charles Whitten also inspected the building, in particular the basement and operating systems. He asked about the storage tanks and was told they were sound and were not leaking. None of the Debtors' representatives mentioned any barrels or drums to the Whittens. Charles Whitten observed the wetlands from the truck terminal parking lot and the roadway. From these vantage points he observed that the wetlands were covered with eight feet high reeds and thick growth. Neither George nor Charles Whitten walked through or onto the wetlands or down the path along the railroad tracks to the rear of the property. George Whitten testified that he saw no reason to as the wetlands were unusable. Consequently, he saw no reason to "go out there," particularly as there was snow on the ground and the river was full.[11] However, Mr. Whitten did concede that the wetlands were useful to the extent that their acreage increased the ratio of land capable of development. Charles Whitten testified that he did not inspect Lot 2 because there was no access to the swamp and the Aberjona River ran through it. Neither George nor Charles Whitten made any particular inquiry about the wetlands. The Whittens both testified that in 1983 they did not observe any barrels on the property and were not made aware of their presence until early 1985.

On January 6, 1983, Mr. Whitten offered to purchase the property from Bristol for $1,450,000, which offer was accepted. The purchase and sale agreement dated March 29, 1993, was drafted by the Whittens' attorney, George Dallas, of the now defunct law firm Gaston & Snow. Mr. Whitten did not discuss CERCLA with his attorney in preparing the purchase and sale agreement. The agreement was based on the 1978 standard form of the Greater Boston Real Estate Board, with revisions, and provided in pertinent part:

4. TITLE DEED—Said premises are to be conveyed by a good and sufficient release deed running to the BUYER, or to the nominee designated by the BUYER by written notice to the SELLER at least seven days before the deed is to be delivered as herein provided, and said deed shall convey a good and clear record and

---

11. At trial, Juniper introduced into evidence three weather reports of the United States Department of Commerce, National Oceanic and Atmospheric Administration, Reading, Massachusetts, which is a town neighboring Woburn, and the closest national weather station to Woburn. The reports indicate that 1) in January of 1983, 4.7 inches of snow fell, and the greatest depth for January was 4 inches on January 22nd; 2) in February of 1983, a total of 22.3 inches of snow fell, and the greatest depth of snow was 18 inches on February 13th; 3) in March of 1983, a total of 2 inches of snow fell; 2) in March of 1983, other precipitation (i.e., rain) totalled 9.72 inches; 4) in March of 1993, the greatest depth of snow was one inch on March 12th; 5) ice pellets fell on March 3rd, 12th, and 13th; 6) there were heavy fog and thunderstorms on March 21st, 22nd, and 28th; and, 7) between February and March of 1983, there was significant melting of snow.

marketable title thereto, free from encumbrances, except

(a) provisions of existing building, zoning laws, environmental and other applicable laws and ordinances....

27. WARRANTIES AND REPRESENTATIONS—The BUYER acknowledges that the Buyer has not been influenced to enter into this transaction nor has he relied upon any warranties or representations not set forth or incorporated in this agreement. Buyer further warrants and represents to Seller that Buyer has made all such inspections of the premises as Buyer wishes to make. It's [sic] a condition to Buyer's obligation to purchase that the Premises may be used as a freight transfer station and warehouse. Prior to the delivery of the deed, Buyer will satisfy himself that such is the case and whether the Premises comply with the Building, Zoning and Wetlands Protection laws.

29. ADDITIONAL PROVISIONS—Seller's obligation to convey is contingent upon Seller having obtained all necessary approvals of the United States Bankruptcy Court for the District of Massachusetts, prior to the date fixed herein for delivery of the DEED, for the performance of all transactions contemplated hereby pursuant to the terms hereof....

30. (untitled) At the time of the delivery of the deed, Seller shall assign to Buyer all valid underground fuel storage permits currently issued on the premises.

Bristol filed a Notice of Intended Sale pursuant to 11 U.S.C. § 363(b); two parties submitted timely counteroffers. Overnite Transportation Company submitted a counteroffer in the sum of $1,515,000.00, and United Truck Leasing Corporation submitted an offer in the sum of $1,520,000.00. David Abrams of United Truck testified that prior to making his counteroffer he visited the Debtor's premises once or twice and inspected the truck terminal portion only, not Lot 2. Frohn testified that none of the other bidders expressed an interest in inspecting the wetlands or asked him about the existence of any hazardous waste information concerning the wetlands.

A hearing was held before the bankruptcy court in April of 1983 on Bristol's Notice of Intended Sale and the counteroffers. Three parties, Juniper, United Truck and Overnite submitted higher offers. Juniper's offer in the sum of $1,632,100.00 was the highest offer, and the sale to Juniper was approved by the bankruptcy court.[12]

On April 27, 1983, Bristol and Juniper agreed to ratify the purchase and sale agreement and to amend it to reflect the increased purchase price. Paragraph 9 was amended as follows:

Buyer has satisfied himself that as of April 22, 1983 there were no outstanding violations of the building, zoning or Wetland Protection Act. Consequently, Buyer waives all rights he has to terminate this agreement due to any building, zoning or Wetland Protection Act violation filed prior to April 22, 1983.

On May 10, 1983, the EPA in an eight page letter, requested information from Hemingway and several additional businesses in Woburn about their properties in connection with its investigation of the source of contamination of Wells G & H. Neither Bristol nor Hemingway apprised Juniper of the EPA letter pursuant to which recipients were to forward information to the EPA within 30 days, with failure to comply resulting in a possible enforcement action.

On May 18, 1993, the sale was closed. Bristol gave Juniper a release deed. The title insurance policy obtained by Juniper, dated May 19, 1983, contains an exception for hazardous waste contamination, and provides in pertinent part:

This policy does not insure against loss or damage by reason of the following:....

16. Liens, whether presently existing or hereafter arising on account of any indebtedness or liability to the Commonwealth of Massachusetts arising pursuant to the provisions of Massachusetts General Laws Chapter 21E (the Massachusetts Oil and

---

12. On April 29, 1983, the bankruptcy court entered an order approving the sale. On May 3, the district court entered an order approving the bankruptcy court's order.

Hazardous Materials Release Prevention and Response Act of 1983).

Mr. Whitten, Mr. Frohn, the real estate broker, and Mr. William McCall ("McCall"), the real estate expert called by Juniper, in testimony that was unrebutted, stated that the sales price reflected fair market value without a deduction or discount for any hazardous waste contamination. Mr. Whitten testified that he had no knowledge of the letters and memoranda prepared by City officials and DEQE agents or any knowledge of the EPA letter of May 10, 1983 requesting information about the property just prior to consummation of the sale.

### E. *The Buyers: Juniper Development Group and the Whittens*

George Whitten testified that he was cognizant of Woburn's hazardous waste problems during the early 1980s, including the closure of Wells G & H. During his forty-eight years in the real estate business, he developed hundreds of commercial and residential properties in Burlington, Wilmington, Reading, Winchester and Woburn. He readily conceded that he had extensive knowledge and experience in buying and selling real estate in Woburn. Between the late 1960s and 1983, Mr. Whitten (or his nominees) bought and/or sold approximately 100 properties in Woburn. As of 1983, Mr. Whitten (or his nominees) owned approximately 50 properties in Woburn. In the 1970s, he and his brothers built the industrial properties on Olympia Avenue that are located on the other side of the railroad tracks from Lot 2, referred to as the S.S. Pierce, United Stationers and Rohtstein buildings. When he and his brothers dissolved their partnership in 1981, Mr. Whitten acquired sole ownership of the S.S. Pierce building, which he sold in 1982. He stated that no hazardous waste issues arose in connection with that sale. Mr. Whitten testified that none of his other Woburn properties currently has or ever has had hazardous waste problems and that he was not aware of the dumping of any barrels on the Hemingway property or the

presence of any barrels on the property until 1985. He also testified that he was sanguine about acquiring the Hemingway property because he thought he was getting title from the United States government.

Additionally, Mr. Whitten indicated that "being a developer and having developed a lot in Woburn, ... [he] ... had a lot of very good friends up there." In particular, Mr. Whitten identified Dennis Marr, whose business was well installations, as the source of his information about Wells G and H and the pollution of the Aberjona River valley.

### F. *Post–Acquisition Events*

Shortly after purchasing the Hemingway property, Juniper was required to expend significant sums with respect to the fuel storage tanks on the property. In July of 1983, Juniper spent approximately $90,000 to remove the underground fuel storage tanks and surrounding soil because they contained water.

In January of 1985, Juniper commissioned a study of the property. Michael Conway ("Conway"), a licensed site professional, formerly employed by Goldberg, Zoino & Associates ("GZA"), inspected the property and prepared a report for submission to Juniper by GZA. In its report, dated February 25, 1985, GZA stated that in its search of DEQE files it had found evidence that Hemingway "reported a complaint that 17 drums containing 'oily type semi-solid waste' had been deposited on the property."[13] During his inspection in January of 1985 from the perimeter of the property, Conway did not observe any barrels on Lot 2. He did not cross or go into the wetlands because he did not believe it to be prudent. He testified that it was difficult to distinguish firm footing from thin ice. He observed at this time that the wetlands area was heavily vegetated and that one could not see very far into them.

GZA reported finding the presence of volatile organic compound in the soil and groundwater, including benzene, toluene, xylene, and ethylbenzene. GZA stated the following:

---

**13.** GZA may well have found Cashins' memo, dated November 11, 1982, to his superiors requesting legal assistance from the Attorney General's office since the language used by Cashins is the same language GZA attributed to Hemingway to describe the contents of the drums.

Groundwater from U.S. EPA observation well No. W–5, on the Charrette property to the north of the subject site, contained volatile organic compounds ... in a sample collected by E & E. These compounds have been found over much of the north-central Woburn area, and their source has not been positively identified. The direction of groundwater flow beneath the subject site is believed to be generally toward the south or southwest. The reported trace levels of chlorinated volatile organic compounds in groundwater at the site are considered reflective of the reported regional groundwater quality.

The aromatic VOCs (i.e., benzene, toluene, xylene, and ethylbenzene) detected in groundwater at location B–2 [a test well located on the northwest side of Lot 1] are constituents of petroleum products, most notably gasoline. The location of observation well B–2 downgradient of the underground gasoline storage tank removed in July 1983 suggests that this tank may have been the source of the identified compounds.

In April of 1985, David Delaney ("Delaney"), a hydrologist with the EPA's Water Supply Branch since 1981, noticed debris and 12 drums, in various stages of corrosion, on the Juniper property while walking up the railroad tracks from Salem Street toward Olympia Avenue. Delaney testified that he observed drums at the rear of the property, which were clearly visible from the path as well as the railroad tracks. He was unable to estimate how long the barrels were there, or how or when they were disposed of on the property. Delaney testified that the barrel site was easily accessible by foot, although he walked through the property in high boots. Delaney called Charles Whitten to report his

discovery. They met within the hour on the property, crossed over the Aberjona River conduit, and walked down the path to the drum site.

Delaney and other EPA agents went to the property again in September of 1985 to take samples from the drums. The drums contained trash and a greasy substance. Approximately 12 pounds of matter were extracted from the drums, were tested, and were found to contain organic chemicals.

In December of 1985, Juniper received "Notification of Potential Liability under Section 104 of CERCLA" from the EPA that it was considered a "potentially responsible party" ("PRP") under CERCLA for the contaminated barrels. In December of 1986, Delaney observed additional drums on the Juniper property in the vicinity as the ones he had previously seen.

Robert Ankstitus ("Ankstitus"), who was the EPA's on scene coordinator for the property in 1985 and 1986, oversaw the drum removal process. In the fall of 1985, Ankstitus visited the property. He testified that he could not see the drums, which were scattered about, from the railroad tracks because a large amount of vegetation screened the drum site location on Lot 2. He also noted that the vegetation was difficult to penetrate.

On February 6, 1986, the EPA issued an administrative order to Olympia Nominee Trust, requiring the employment of a contractor, the development of a removal plan, and removal of 17 drums.[14] Ankstitus testified that, although there was a ten month delay between the time Delaney discovered the barrels and their removal due to problems finalizing the EPA order, Juniper promptly complied with the order and cooperated with the EPA in the drum removal

---

**14.** The court in *In re Hemingway Transp., Inc.,* 105 B.R. 171 (Bankr.D.Mass.1989) noted the following:

The order contained an administrative determination that the Olympia Avenue property was a "facility" as defined in section 101(9) of CERCLA, 42 U.S.C. § 9601(9); that the trustees of the 60 Olympia Avenue Nominee Trust [sic] were "persons" and "owners" as defined in sections 101(21) and (20), respectively, of CERCLA, 42 U.S.C. § 9601(21), (20); that substances found in the soil and drums on the

property were "hazardous substances" as defined by section 101(14) of CERCLA, 42 U.S.C. § 9601(14); that the past, present and potential migration of such hazardous substances constituted an "actual or threatened release" as defined by section 101(22) of CERCLA, 42 U.S.C. § 9601(22); and that the trustees as present owners of the Olympia Avenue property were responsible parties pursuant to section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

*Id.* at 172.

process. In order to comply with the order, Juniper was required to construct a bridge over the Aberjona River so that a backhoe could be driven over Lot 2, as there was no road access to the drum site and the B & M requirements in terms of logistics and money were so onerous as to make access to the site over the railroad tracks out of the question. The site also had to be cleared of trees and shrubbery.[15]

In 1986, Ankstitus chased several teenagers from the drum site. He testified that they were "freebasing" toluene at the site, a hazardous chemical which was found in the soil of the property sampled by the EPA. Approximately one year after the drums were removed pursuant to the EPA order, three or four additional drums were found on Lot 2 farther into the wetlands. These were missed in the initial round of cleanup because they were located behind other vegetation.

The EPA's investigation into Wells G & H is ongoing. In 1989, the EPA was still unsure as to the sources of contamination of Wells G & H, although it had notified the Olympia Nominee Trust of its potentially responsible party ("PRP") liability for Wells G & H, a liability which is currently estimated to be in excess of $6,000,000. The EPA has not yet filed an action to assess the amount of Juniper's PRP liability, which as of this date remains undetermined.

### G. The Expert Testimony and Due Diligence Standards

CERCLA became effective on February 11, 1980, and the Massachusetts Oil and Hazardous Material Release Prevention Act, Mass.Gen.Laws Ann. Ch. 21E, §§ 1–18 (West Supp.1994) ("Chapter 21E") became effective on March 24, 1983. At the time Juniper acquired the Hemingway property, the innocent landowner defense, which was added to CERCLA by the SARA amendments in 1986, was unavailable. Additionally, it was not the practice of prospective buyers, their lenders, or title insurance companies to perform or require hazardous waste assessments on real

estate until June or July of 1983. Hazardous waste site assessments were not common in early 1983 when the Whittens were negotiating the acquisition of the property.

The uncontroverted evidence at trial was that in 1983 no governmental agency, not the DEQE, the EPA or the City of Woburn, had a system for investigating hazardous waste problems associated with a particular property. In 1983, the DEQE did not maintain files for individual properties. Although a prospective buyer could call a site manager at DEQE for information about a particular property, there was no established or commonly known procedure for making inquiry about a property. It was not common for buyers to contact DEQE in 1983 for hazardous waste information about particular properties. Similarly, EPA had no system in place until 1984 for investigating particular properties.

Mr. Whitten testified that in 1983 he was aware that hazardous waste laws "were coming into existence." Moreover, Mr. Whitten knew that, as of 1981, the City of Woburn had hazardous waste regulations governing the issuance of building permits. In 1983, the City had an official hazardous waste coordinator, Thomas Mernin. His files, which were mostly newspaper articles, were available for public inspection, but they were organized by year only and were not indexed by property address or owner. There was no evidence that he had any records specifically related to the Hemingway property in 1983. A prospective buyer would simply be given access to Mernin's file cabinet.

There was conflicting evidence presented at trial on the applicable standards of diligence which a buyer of Woburn real estate in 1983 should have met. The Trustee's witness, Charles O'Neal ("O'Neal"), an attorney, real estate broker and appraiser, had considerable experience in the real estate business, but little experience in buying, selling, or leasing property in Woburn. Mr. O'Neal testified that the Whittens should have inspected the entire property, including the

---

**15.** In *In re Hemingway Transp., Inc.,* 108 B.R. 378 (Bankr.D.Mass.1989), the court noted that the parties stipulated that if all the elements of section 9707(a)(4)(B) of CERCLA were estab-

lished by Juniper, Juniper's costs were as a result of a release or threatened release of hazardous substances, necessary and consistent with the National Contingency Plan. *Id.* at 380.

perimeter and the wetlands. He also stated that the terms of the purchase and sale agreement were not customary as: 1) the agreement called for the delivery of a "release" deed; and 2) the sale was subject to environmental laws. According to O'Neal, these factors should have triggered increased scrutiny by the buyer. Moreover, since Juniper warranted in the agreement that it had made all inspections it wished to make, O'Neal opined that it should have made a more thorough inspection of the land, including walking the property "to the fullest extent possible."

On the issue of due diligence, Juniper presented the testimony of William McCall ("McCall"), a real estate broker, consultant, appraiser, and commercial property owner and manager, who has had substantial experience in buying, selling and leasing property in Woburn during the past thirty years. Mr. McCall testified that a prudent inquiry of this property in 1983 would have centered on an inspection of the buildings and truck terminal only. According to McCall, in early 1983, environmental assessments of and inquiry into hazardous waste problems were not yet customary. In his view, inspection of the usable acreage, Lot 1, was sufficient because a buyer would be unable to develop or use the wetlands portion of the property. According to McCall, a diligent buyer would not have walked the path. He further testified that Woburn was a "hot" commercial market in 1983, notwithstanding its hazardous waste problems because of the new intersection of Routes 93 and 128. According to McCall, the closure of Wells G & H did not affect commercial real estate sales prices in Woburn in 1983.

## III. POSITIONS OF THE PARTIES

### A. Juniper

Juniper argues that its preacquisition inquiry was diligent under the circumstances existing in 1983. It maintains that it had no actual knowledge and no reason to know of any contamination on the property. An inspection of the wetlands was unnecessary in its view because they were unusable and inaccessible. It stresses that the potential for a more in-depth inspection does not defeat innocent landowner status. It cites the following factors: inspections were not customary; none of the other interested parties inspected the wetlands; and an inspection of the wetlands abutting Lot 1 would not have been prudent at the time of year it was negotiating the purchase. Moreover, Juniper points out that even if the Whittens had walked the perimeter of the property in 1983, they would not have seen the barrels because a view of the drum site was screened by vegetation.

Juniper also asserts that it was diligent after the purchase. Once it became aware of the barrels it was diligent in removing them in accordance with the EPA order.

### B. The Chapter 7 Trustee

The Trustee argues that Juniper is not an innocent purchaser. He emphasizes that in 1983 the Whittens were sophisticated developers, that Woburn was notoriously tainted, and that the terms of the purchase and sale agreement should have triggered further inquiry. He also argues that Juniper's inspection, which was tantamount to no inspection at all, was insufficient. In his view, Juniper had a duty to inspect the entire property, including the wetlands where the barrels were found, and, since it did not do so, Juniper is liable for all environmental contamination.

In addition, the Trustee argues that Juniper did not establish that its post-acquisition conduct was diligent because teenagers used hazardous chemicals on the property. *See* 42 U.S.C. § 9601(35)(D).[16] More importantly, the Trustee argues that the Olympia Nominee Trust, the present owner of the facility, is the only entity statutorily entitled to assert the innocent landowner defense. Since Juniper Development Group transferred the property to the trustees of the Olympia Nominee Trust on March 15, 1985, after re-

---

16. Section 9601(35)(D) provides that the innocent landowner defense cannot affect "the liability under this chapter of a defendant who by any act or omission, caused or contributed to the release or threatened of a hazardous substance which is the subject of the action relating to the facility." 42 U.S.C. § 9601(35)(D).

ceipt of the GZA report with its reference to the DEQE report about the presence of barrels on the property, the Trustee maintains that the trust, the present owner, cannot establish the defense. *See* 42 U.S.C. § 9601(35)(C).[17]

## IV. DISCUSSION

### A. *The Statutory Framework and the Case Law*

CERCLA imposes on any owner of a facility that is contaminated with hazardous substances liability for all costs associated with the investigation and remediation of the property. 42 U.S.C. § 9607(a)(4)(A)–(C). *See* note 2 *supra.* In 1986, CERCLA was amended to provide protection from strict liability for cleanup costs to innocent purchasers of contaminated property. *See* 42 U.S.C. § 9607(b)(3) and § 9601(35) at notes 6–7 *supra.*

■■■ A purchaser is absolved from liability if it discovers that the property is contaminated with hazardous waste after the purchase if it proves by a preponderance of the evidence that it did not know the property was contaminated and that there was no reason to know of such contamination. 42 U.S.C. § 9601(35)(A). The SARA amendments to CERCLA require that in order to satisfy the elements of the innocent purchaser test, a property owner must have made "all appropriate inquiry" at the time of its acquisition:

> To establish that the defendant had no reason to know [of the presence of hazardous waste on the property, the] defendant must have undertaken, at the time of the acquisition, all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice in an effort to minimize liability.

For purposes of the preceding sentence the court shall take into account any specialized knowledge or experience on the part of the defendant, the relationship of the purchase price to the value of the property if uncontaminated, commonly known or reasonably ascertainable information about the property, the obviousness of the presence or likely presence of contamination at the property, and the ability to detect such contamination by appropriate inspection.

42 U.S.C. § 9601(35)(B). The statute does not provide guidelines for determining what is "good commercial or customary practice," or "commonly known or reasonably ascertainable information about the property," or "appropriate inspection." The legislative history of the SARA amendments indicates that the standard of "all appropriate inquiry" was intended to evolve continuously and "[defendants] shall be held to higher standards as public awareness of the hazards associated with hazardous substance release has grown...." H.R.Conf.Rep. No. 962, 99th Cong., 2d Sess. (1986), U.S.Code Cong. & Admin.News 1986, p. 2835. The requirement was intended to be flexible:

> Congress used terms like "appropriate" and "reasonable" in describing the necessary inquiry. The choice of such terms indicates ... that Congress was not laying down [a] bright line rule.... Rather, Congress recognized that each case would be different and must be analyzed on its own facts.

*U.S. v. Pacific Hide and Fur Depot, Inc.,* 716 F.Supp. 1341, 1348–49 (D.Idaho 1989).

■■■ In addition, to qualify for the defense, the innocent purchaser must show that he "exercised due care with respect to the hazardous substance" and "took precautions against foreseeable acts or omissions of any such third party and the consequences that

---

**17.** Section 9601(35)(C) provides in relevant part the following:

> Nothing in this paragraph or in section 9607(b)(3) of this title shall diminish the liability of any previous owner or operator of such facility who would otherwise be liable under this chapter. Notwithstanding this paragraph, if the defendant obtained actual knowledge of the release or threatened release of a hazard-

> ous substance at such facility when the defendant owned the real property and then subsequently transferred ownership of the property to another person without disclosing such knowledge, such defendant shall be treated as liable under section 9607(a)(1) of this title and no defense under section 9607(b)(3) of this title shall be available to such defendant.

> 42 U.S.C. § 9601(35)(C).

could foreseeably result from such acts or omissions." 42 U.S.C. § 9607(b)(3). A landowner cannot "shield himself with his asserted ignorance of the nature of the hazard...." *U.S. v. DiBiase Salem Realty Trust,* No. 91–11028–MA, 1993 WL 729662 at *6 (D.Mass. Nov. 19, 1993). "[L]andowners cannot avail themselves of the innocent [purchaser] defense by closing their eyes to hazardous waste problems." *U.S. v. Serafini,* 706 F.Supp. 346, 353 (M.D.Pa.1988). Moreover, CERCLA "does not sanction ... willful or negligent blindness...." *U.S. v. Monsanto Co.,* 858 F.2d 160, 169 (4th Cir.1988). However, "the due diligence standard is entirely relative and must be measured as of the time that the property is acquired." R. Patrick Quinn, *All Appropriate Inquiry & CERCLA's Innocent Purchaser Defense: the Need for a Legislative Standard,* 5 Hofstra Prop.L.J. 65, 71 (1992).

This Court has been unable to locate any decisions of the courts of appeal interpreting the meaning of "all appropriate inquiry" under the innocent purchaser defense. Additionally, there are few decisions in which the innocent purchaser defense has been successful. In *U.S. v. Serafini,* 706 F.Supp. 346 (M.D.Pa.1988), the government, in 1986, sued an owner and its partners for response costs for the cleanup of a site 17 years after its purchase, which site was obviously littered with over 800 drums containing hazardous substances at the time of purchase. Prior to purchase, the buyer neither visually inspected nor inquired into the past uses of the property, examining the property only through the use of maps. The government moved for summary judgment, arguing that the failure to conduct an inspection established that the buyer did not qualify as an innocent purchaser as a matter of law. *Id.* at 352. The court denied the motion for summary judgment because the government had not presented evidence "that the defendant's failure to inspect or inquire was inconsistent with good commercial or customary practices," *id.* at 353, adding that the government did not submit affidavits from real estate developers that it was customary and good commercial practice to visually inspect property. *Id.* at 353 n. 8. Thereafter, the government filed affidavits from real estate de-

velopers to the effect that the failure to inspect was not good practice at the time. The buyers filed counter affidavits that in 1969 viewing maps was good commercial practice. Again, the court denied the motion for summary judgment, finding that the facts concerning appropriate inquiry were in dispute and warranted a trial. *U.S. v. Serafini,* 711 F.Supp. 197 (M.D.Pa.1988). Not surprisingly, the *Serafini* opinion has been criticized as an example of the unwillingness of courts to impose CERCLA liability on individuals. *See* Richard H. Mays, *The Blessed State of Innocence: The Innocent Landowner Defense Under the Superfund,* 20 Env't Rep. (BNA) 809 (1989).

In *U.S. v. Pacific Hide & Fur Depot, Inc.,* 716 F.Supp. 1341 (D.Idaho 1989), the government sought to recover cleanup costs from the owners of property who obtained their interests by inheritance from their parents and grandparents. They had not been involved in management of the site during the period of hazardous waste contamination. The court held that they were entitled to assert the innocent landowner defense despite their failure to make any inquiry into the condition of the property, reasoning that 1) inheritances should be treated leniently; 2) there was no evidence that the contamination was obvious; and 3) the owners had no special knowledge and were unsophisticated. *Id.* at 1348–49.

In *Internat'l Clinical Labs., Inc. v. Stevens,* 20 Envtl.L.Rep. 20,560, No. CV 87–3472, 1990 WL 43971 (E.D.N.Y. January 11, 1990), the court found that the buyer of a 2.9 acre parcel and a building used by a former lessee to manufacture computer tape heads was an innocent purchaser because it had no knowledge of the contamination on the property, even though the site had been listed by the state Department of Environmental Conservation in 1984. Unfortunately, the court did not describe the nature and extent of the buyer's pre-acquisition inquiry with respect to the purchase which took place in 1986 when the lessee was still in possession. However, it found there were no obvious or visible problems with the property, there had been no disclosure of any environmental problems, and the purchase price gave no

indication of a hazardous waste problem. *Id.* at 20,561.

Decisions where the innocent purchaser defense has been unsuccessful are numerous but do little to assist in resolving the meaning of all appropriate inquiry. In *Wickland Oil Terminals v. Asarco Inc.*, 1988 WL 167247 (N.D.Cal. Feb. 23, 1988), the court considered a suit against Asarco in which Wickland sought damages, declaratory relief and indemnity under CERCLA with respect to its purchase of property from Asarco in 1977. In the suit, Wickland sought to establish that it was not strictly liable for cleanup costs, offensively employing the innocent landowner defense. The court rejected the innocent landowner defense, however, because of Wickland's knowledge of the presence of metal smelting slag on the property. The court found that the buyer's awareness of a risk of future problems, advice from a governmental official to obtain legal counsel, its failure to examine public records, and its failure to do test borings, indicated the buyer knew or had reason to know of the hazardous waste on the site. *Id.* at *4.

In *CPC Internat'l, Inc. v. Aerojet–General Corp.*, 777 F.Supp. 549 (W.D.Mich.1991), the court found the defense did not apply where the buyer of a closed chemical manufacturing plant from a bankruptcy trustee knew at the time of the purchase that the facility was contaminated, although it did not know the true extent of the contamination. In addition, it appeared that the buyer had aggravated the contamination. *Id.* at 581.

In *BCW Assocs., Ltd. v. Occidental Chemical Corp.*, No. 86–5947, 1988 WL 102641 (E.D.Pa. Sept. 29, 1988), the court considered a suit brought by the buyer of property in Pottstown, Pennsylvania from Occidental Chemical Corp., which in turn had acquired the property from Firestone Tire and Rubber Company. Firestone had used the facility for white walling tires, a process that generated dust contaminated with lead. The buyer and its lessee sued the former owners for cleanup costs after discovering the contamination. Prior to the purchase in July of 1984, both the buyer and its lessee had independent reports prepared by engineering consulting firms, in which experts concluded there were no environmental problems. The court, however, concluded that the buyer and its lessee did not exercise due care or take adequate precautions because of the nature of the lessee's activities, which caused the contaminated dust to "rain down" from the rafters. This case has been criticized by at least one commentator who had difficulty imagining what more the buyer and the lessee could have done to avoid liability. *See* L. Jager Smith, *CERCLA's Innocent Landowner Defense: Oasis or Mirage*, 18 Colum.J.Envtl.L. 155 (1993).

 Although reconciling the above decisions is difficult because each property and sale is different, the Court discerns several lessons from the decisions. First, the appropriate standard must necessarily change over time. An appropriate inquiry into possible contamination in 1983 is not the same as one in 1994. Secondly, the defense can be lost if the buyer obtains knowledge of hazardous waste and does not act upon it. Thirdly, the utility of the defense is unpredictable because of the amorphous nature of the language utilized by Congress and the seeming unpredictability of the application of the law to the facts. *Compare Serafini* (on motion for summary judgment, the court refused to find the buyers were not innocent landowners even though a cursory physical inspection of the property would have revealed hundreds of drums) *with BCW Assocs.* (the court refused to find that the buyer qualified for the innocent landowner defense even though the buyer obtained a report from an engineering firm indicating that the property was not contaminated with hazardous wastes).

### B. *Issues*

With this background, the issues that the Court must decide include the following: 1) Did Juniper make all appropriate inquiry into Bristol's ownership and use of the property? 2) Was this inquiry consistent with good commercial and customary practice? 3) Did Juniper's inquiry constitute an effort to minimize liability? 4) What specialized knowledge did the Whittens possess? 5) What was the relationship between the purchase price and the value of the property if uncontaminated? 6) What information was

known or reasonably ascertainable about the property? 7) How obvious were the barrels or how likely was there to be contamination on the property? 8) What ability did Juniper have to detect the barrels by appropriate inspection? 9) Is there a merger of the trustees and Juniper Development Group because the trustees of the Olympia Nominee Trust and the partners of the beneficiary of that trust are the same? 10) Did Juniper and/or Olympia Nominee Trust exercise due care with respect to the hazardous substances concerned? 11) Did Juniper and/or Olympia Nominee Trust take precautions against foreseeable acts or omissions of any third party?

### C. *Analysis*
#### 1. Appropriate Inquiry

 Juniper's inquiry about the Hemingway property was limited to a series of questions directed to Hemingway personnel about the status of the fuel storage tanks and the potential contamination of Lot 1. Other than a visual inspection of the wetlands from Lot 1 and Olympia Avenue, the Whittens made no inquiry about or attempt to inspect Lot 2. They neither walked the perimeter of the property nor the sewer easement, which was delineated on the plot plan and visible as a path from Olympia Avenue. They made no attempt to contact any department of the City or the DEQE about the property even though the property was in close proximity to a Superfund site (Wells G & H) and Woburn was receiving national attention about its hazardous waste problems and elevated childhood leukemia rates.

This conduct coupled with the terms of the purchase and sale agreement and the notoriety and proximity of hazardous waste problems in Woburn preclude a finding that Juniper made all appropriate inquiry. The red flags including 1) the release deed provision; 2) the "environmental law" provision; 3) the "Wetlands Protection Act" provisions; and, 4) the "inspection" warranty were disregarded as inconsequential by Juniper. The "as is" nature of the sale from a bankrupt company, the absence of any warranties by Bristol, the language inserted in the standard form agreement that the sale was subject to existing environmental laws, and Juniper's representation that he had made all inspections it wished to make, as opposed to inspections it could or should have made, bolster the conclusion that while representing it made all appropriate inquiries, Juniper did not in fact make such inquiries.

#### 2. Good Commercial and Customary Practice

 Two parties who offered to buy the Hemingway property and who submitted counteroffers at a hearing in the bankruptcy court conducted the same type of inquiry as Juniper. There was no evidence about other property transfers in Woburn in 1983 and no evidence about what types of inquiries other purchasers made in early 1983. Mr. McCall indicated that what Juniper did was customary; Mr. O'Neal, taking the common sense approach, indicated that a purchaser of any type of property should inspect the property by walking as much of it as possible.

The parties agree that due diligence standards have become higher since the sale in this case. The Trustee is not suggesting that Juniper should have commissioned a professional hazardous waste study of the property. In early 1983, at the time this sale was closed, professional environmental site assessments were not yet common or customary. Instead, the Trustee argues that there were environmental "red flags", namely, the City's well-publicized problems with hazardous waste and the sale agreement's terms that made the sale subject to all environmental laws and regulations, that should have triggered a more in-depth investigation into the property, including a walk down the path, which would have uncovered the barrels.

The Court finds that Juniper failed to carry its burden of proof by a preponderance of the evidence that the inquiry it made constituted *good* customary or *good* commercial practice. The Trustee persuasively observed that just because the lack of diligence may have been routine it does not follow that the customary practices were either good or commercially reasonable.

#### 3. Minimization of Liability

 The Court cannot find that Juniper's inquiry constituted an effort to minimize lia-

bility. If anything, Juniper's conduct demonstrated obliviousness toward potential environmental liability, particularly in light of the provisions of the title insurance policy and other sale documents. Moreover, the passage of Chapter 21E just prior to the sale should have alerted Juniper to the increasing prominence of environmental issues in sales transactions. Rather than motivating Juniper to do more due diligence, Mr. Whitten indicated that he did not discuss the ramifications of Chapter 21E or CERCLA with his attorney. This was an egregious omission in view of the underground storage tanks located on Lot 1, which, as GZA discovered, were the likely source of some contamination to the property with gasoline derivatives.

#### 4. Specialized Knowledge

It may be inferred that the Whittens, as experienced developers in Woburn, had specialized knowledge about building and land use ordinances. However, there was no evidence that they had any special knowledge about the Hemingway property before its acquisition.

#### 5. Purchase Price vs. Value if Uncontaminated

The evidence was unequivocal. Juniper paid fair market value for the property, and the purchase price did not reflect a discount for contamination.

#### 6. Information Known vs. Information Reasonably Ascertainable

■ The Whittens had no actual knowledge that there was hazardous waste on the property, including the presence of barrels in the southwest corner of the property, at the time of the offer, the purchase and sale agreement, or closing of the sale. The Debtors' representatives did not disclose to Juniper that in 1982 the DEQE had ordered removal of a number of barrels from the southwest corner of the property. Moreover, the Debtors did not disclose to Juniper that one week prior to the sale closing, it had received a written inquiry and request for information concerning the property from the EPA in connection with that agency's investigation of Wells G & H. Although the Whittens were sophisticated developers, knowledgeable about Woburn property and

were prime developers in the immediate vicinity of the property, there was no evidence that they had any special information about the Hemingway property that would have lead a reasonable person to suspect that it was contaminated with hazardous waste.

However, the Court can easily infer that had the Whittens exerted a modicum of effort they may easily have discovered information that at a minimum would have compelled them to inspect the property further for contaminants. Even though levels of scrutiny for hazardous substances have increased overtime, the Whittens could have taken a few significant steps, literally, to minimize their liability and discover information about the property far short of an expensive site assessment like the one prepared for them by GZA in 1985. These actions would have included a physical inspection of the west side of the property and telephonic inquiry to City officials. The evidence before the Court, though conflicting, including aerial photographs, testimony, and the Court's own perceptions following two views of the property, is sufficient for this Court to conclude that had the Whittens walked along the railroad tracks or the sewer easement they would have seen industrial debris and, given the time of year, at least some barrels as well.

■ The evidence was uncontroverted and overwhelming that the public agencies with jurisdiction over hazardous waste matters, City, state and federal, had no established system in place in early 1983 that would have made records concerning hazardous waste contamination of this or any property readily obtainable to a prospective purchaser, and that it was not customary for prospective buyers to review DEQE or EPA files at that time. Moreover, the newspaper articles about Woburn in general and the dumping of barrels between Salem Street and Olympia Avenue did not directly link the Hemingway property to the site of the dumping. Accordingly, the Whittens cannot be faulted for failing to investigate records that were not catalogued for public inspection.

Having made that observation, the Court finds, as a practical matter, that City officials

and DEQE agents could have been reached telephonically. Given Mr. Whittens' position as a prominent developer in the City of Woburn, the Court has no difficulty finding that a series of a few short phone calls could have put a diligent buyer in contact with either Mr. Mernin or Mr. Cashins, whose office was in Woburn. Although records were neither catalogued nor indexed in such a way as to enable a prospective buyer to easily examine records, the Court finds that the publicity about and correspondence between the City and the DEQE with respect to the barrels would have made it likely that had an inquiry been made to either the City or the DEQE, Juniper reasonably could have ascertained information about the Hemingway property or property contiguous to it that would have compelled Juniper to inspect the property more fully. Indeed, Mr. Whitten testified that he "had a lot of friends up there [in Woburn]." Thus, the Court finds that Juniper failed to establish that information was not reasonably ascertainable.

### 7. The Obviousness and Likelihood of Contamination

With respect to the City's notorious problems with hazardous waste contamination, the Court does not accept the Trustee's assertion that just because the property was in Woburn, close to Wells G and H, Juniper was on notice that the Hemingway property was likely to be contaminated with hazardous waste. Although it was commonly known to the public and to the Whittens that Woburn had hazardous waste problems in 1983, it was not commonly known that the Hemingway property itself had such problems or was even suspected of such problems at that time. In 1983, the cause of the contamination of Wells G and H were uncertain. Even now, the extent of contamination of the area in which the property is located and the source of the contamination is undetermined as the PRP contributions of numerous property owners has not yet been established.

Nevertheless, Beatrice Foods Company and/or John J. Riley Company owned property neighboring the Hemingway property and were defendants in a highly publicized law suit. This lawsuit coupled with the notoriety of Woburn's hazardous waste problems and the proximity of Wells G & H imposed upon Juniper a duty of care higher than that that would be imposed on prospective purchasers of property elsewhere. Juniper's level of inquiry was limited to discussions with Hemingway personnel about the conditions of the terminal buildings and underground fuel tanks. Had the Whittens walked the sewer easement path, at least some of the barrels would most likely have been obvious in the early months of 1983. Given the proximity of the Hemingway property to Wells G & H and the plot plan showing possible access to the property from the sewer easement and the railroad tracks from Aberjona Auto Parts, Inc., Whitney Barrel and John J. Riley Company, there was at least a possibility that the property was the source of the contamination of the groundwater—a possibility that warranted a more thorough assessment of the property than what was done.

This conclusion is buttressed by the recent decision in *Cummings Properties Management, Inc. v. W.R. Grace & Co.*, No. 91–2641, slip op. (Mass.Superior Ct. January 19, 1994), a case involving property at 21 Olympia Avenue and elsewhere in Woburn in which the court specifically considered Cummings assertion that "it did not know or should not have reasonably known, before April 21, 1985, that the defendants were a probable source of its injury," *id.* at 12, with respect to claims involving Chapter 21E, negligence, trespass, nuisance and strict liability. In upholding a statute of limitations defense, the court in deciding that Cummings knew or should have known of the potential responsibility of the defendants for environmental injuries to its properties outlined the following considerations among others: 1) the 1979 shut down of Wells G & H; 2) the proximity of Cummings' properties to Wells G & H; 3) the widespread media coverage and hundreds of articles, "some of which referred to a 'diluted chemical soup' which flowed under Woburn," *id.* at 13; 4) the installation of monitoring wells by the EPA to sample the groundwater; and 5) the leukemia victims' lawsuit that was commenced in May of

1982.[18] These same factors pertain to the instant case and compel the conclusion that there was some likelihood of contamination of the Hemingway property that warranted a more careful investigation of the property than what was done.

### 8. Juniper's Ability to Detect the Barrels

█ Had the Whittens exhibited a bit more cautionary interest in the wetlands and the nature and possible use of the sewer easement reflected on the plot plan, they could have easily walked down the path toward Salem Street. As the court noted in *In re Hemingway Transport, Inc.*, "easy access to the location of the barrels is possible along the City or Woburn's sewer easement, which parallels the MBTA tracks." 108 B.R. at 380. Additionally, Cashins and Delaney testified that they spotted some of the barrels without difficulty as they walked path. Although Ankstitus testified the barrels were not visible from the path, he walked the path in the fall of 1985, a time of year when the vegetation would have been at its fullest. The Court finds that the testimony of Cashins and Delaney was more persuasive than that of Conway, the GZA engineer. The Court is persuaded that Conway's investigation of the site was deficient, particularly because he was on notice that barrels might be present on Lot 2. Ms. Gevalt, the geologist and licensed site professional called by the Chapter 7 Trustee, reached the same conclusion, criticizing the GZA report's overall lack of thoroughness.

### 9. Merger

The Trustee contends that Olympia is not an innocent landowner as a matter of law because it accepted the transfer of the property in March of 1985 with specific knowledge of the contamination. In *United States v. DiBiase Salem Realty Trust*, 1993 WL 729662 (D.Mass. November 19, 1993), the court rejected the defendant's innocent landowner defense "because the [current owner] acquired the Site with full knowledge of the contamination." *Id.* at *7. The court rejected as "plainly wrong" the argument by the current owner, a realty trust, that even though the original purchaser, a related corporation, may have been liable under CERCLA, the transfer of the site to the trust broke the chain of liability. *Id.* at *8. As the trust knew it was acquiring contaminated land, it was precluded by law from asserting the innocent purchaser defense. "Precluding the innocent purchaser defense where a defendant essentially transfers the land to himself serves important policy objectives. Interpreting the statute to permit a 'sham' transfer to free the defendant of liability would certainly frustrate the remedial purpose of the statute. (Citation omitted)." *Id.*

█ Juniper did not introduce into evidence the partnership agreement pertaining to the Juniper Development Group or the documents creating the Olympia Nominee Trust. Although the parties stipulated that Juniper Development Group is the beneficiary of the trust, the Court is not in a position to find that the trust is a sham or that there is a merger of the trust and the beneficiary without an examination of the trust instrument itself. The Court cannot find that because the trust includes the word "nominee" in its name that it is in fact a nominee trust. Accordingly, the Court finds that Juniper Development Group and the Olympia Nominee Trust are separate entities.

█ The Whittens were alerted to the possible presence of hazardous waste in February of 1985 as a result of the GZA report, as well as the presence of organic compounds in the soil on Lot 1. Accordingly, as trustees of the Olympia Nominee Trust, they are ineligible to assert the innocent landowner defense. However, the defense is available to the partnership because section 9607(b)(3)

---

18. The court also stated the following:

[I]n a report dated March 8, 1982, the EPA's consultants [E & E] concluded that "the contaminants influencing Wells G & H are likely coming from an area north and/or northwest of the wells." ... Even if it is not established that Mr. Cummings received this particular report, it is clear that all the EPA test results were available to plaintiffs. Having been put on notice of injury to its property, and of its likely sources ... Cummings was free to request information from the EPA, to file an FOIA request to the EPA, and/or to conduct its own environmental investigation (which it consciously chose not to do).

Slip op. at 16 n. 17.

refers to a "person otherwise liable" under 9607(a), which includes "any person who at the time of disposal owned or operated any facility at which such hazardous substances were disposed of." Moreover, section 9601(35)(C) only bars assertion of the defense by an owner who transfers ownership without disclosing knowledge of the hazardous wastes. Since the partners of Juniper and the trustees are the same except for Miller (the record is unclear as to whether he remains a partner), the requisite disclosure is obvious, and the Court finds that the trustees of Olympia were aware of the contents of the GZA report submitted to Juniper. Accordingly, Juniper Development Group is not barred from asserting the defense. *See Westwood Pharmaceuticals, Inc. v. Nat'l Fuel Gas Distrib. Corp.,* 964 F.2d 85, 91 (2d Cir.1992).

### 10. Due Care

██ The testimony was uncontroverted that Juniper responded to the EPA administrative order and removed 17 barrels in accordance with the terms of that order. However, the Court, during both its views of Lot 2 observed barrels on the property in the vicinity of where the 17 barrels were located as well as the presence of a greenish, almost black, tar-like substance pooled on the ground. While Juniper complied with the EPA's order it would appear that potentially hazardous substances *may* remain on Lot 2, and these, in turn, may be a source of groundwater contamination. Accordingly, the Court finds that Juniper has not established by a preponderance of the evidence that it exercised due care.

### 11. Precautions against Foreseeable Acts

██ The Trustee argues that the Whittens are not innocent landowners due to the post-acquisition disposal of hazardous substances on the property, namely a gallon can of toluene, discovered by Ankstitus in 1986, after he chased teenagers who were "free-basing" the toluene from the property. The existence of toluene in the soil adjacent to the drums was noted in the EPA's administrative order issued in 1986, although it was not found in the actual drums. The Trustee argues that Juniper did not prove that the soil was contaminated with toluene before its acquisition of the property, and, thus, Juniper did not meet its burden of proving that there were no post-acquisition disposal of hazardous waste on the property. The Trustee's argument, while extremely technical, is not without merit.

The Court also notes from its observations of the property, that Lot 2 is accessible from Olympia Avenue, from across the railroad tracks and from the sewer easement which extends along the tracks north of Olympia Avenue. The Court observed a considerable amount of debris on Lot 2 in the vicinity of the path ranging from candy wrappers to rusted cans and plastic containers of paint thinner to large chunks of twisted metal. There was evidence that one of the barrels was used for a campfire. Although the EPA order did not require Juniper to fence the site, the Court observed that there were no "NO TRESPASSING" signs anywhere on Lot 2. Accordingly, the Court finds that Juniper failed to sustain its burden of proof as to precautions against foreseeable acts of third parties.

## V. CONCLUSION

The United States Court of Appeals for the First Circuit indicated that Juniper would have the ultimate burden of establishing the innocent landowner defense and that "[a]s an acquiring party and an owner of the facility at the time of 'passive' disposal . . . [it] . . . would be held to an especially stringent level of preacquisition inquiry." 993 F.2d at 933. The evidence presented by the parties was not unequivocal. Both parties submitted testimony and exhibits that were persuasive. Neither the evidence nor the seemingly illusive innocent landowner standard enabled this Court to reach a decision with ease. Moreover, the Court cannot ignore the "damned if you do, damned if you don't" conundrum confronting Juniper:

> Lenders are required to conduct a careful inquiry as to the existence of contamination, but if it is found, the [innocent purchaser] defense is not available. If it is not found, the inquiry was not thorough enough.

Lender Liability Under Hazardous Waste Laws; Hearings Before the Sub-comm. on Policy Research and Insurance of the House Comm. on Banking, Finance And Urban Affairs, 102d Cong., 1st Sess. 46 (1991) (statement of Jake Garn, Senator, Utah).[19] However, after an examination of all the evidence in relation to the innocent landowner defense "as it is," *see U.S. v. Alcan Aluminum Corp.*, 990 F.2d 711, 716–17 (2d Cir.1993) ("There may be unfairness in the legislative plan, but … we still must take this statute as it is.") and with deference to the directions of the court of appeals, this Court finds that Juniper failed to establish the defense by a preponderance of the credible evidence. The Court is persuaded that the limited inquiries made by Juniper prior to the consummation of the sale did not establish that Juniper undertook "all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial and customary practice in an effort to minimize liability," in view of the numerous and compelling "red flags" that cautioned against a "business as usual" approach to the acquisition of the Hemingway property. Accordingly, the Court finds that Juniper is, in the words of the court of appeals, exposed to "the harsh consequences of strict, joint and several liability under CERCLA." *In re Hemingway Transp., Inc.*, 993 F.2d at 934.

**ORDER**

In accordance with the Memorandum dated November 1, 1994, and the order of remand from the United States Court of Appeals for the First Circuit, *In re Hemingway Transp., Inc.*, 993 F.2d 915 (1st Cir.1993), the Court hereby finds that Juniper Development Group and George D. Whitten, Amy D. Whitten and Charles D. Whitten as Trustees of Olympia Nominee Trust are not "innocent landowners" as that term is defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601–9657 (1988).

---

**19.** *See also U.S. v. A & N Cleaners and Launderers, Inc.*, 854 F.Supp. 229, 239 (S.D.N.Y.1994), in which the court harshly criticized CERCLA and stated that "[e]vidence of CERCLA's deficiency can be seen in the fact that, after fourteen years and over eighteen billion dollars spent on the CERCLA program, only 12% of the sites on the NPL [National Priorities List] have been cleaned up." The court added that

[i]f Congress must shift the costs of ferreting out contamination from the general public to those involved in real estate transactions it should, at a minimum, define the scope of the required investigation…. By imposing a standard of diligence which the Government itself can neither meet nor define, CERCLA has imbued the conduct of business with unnecessary peril, and has made the current Defendants liable for our collective failure to fashion a reasonable response to the problems of chemical contamination.

*Id.* at 242.